## EXHIBIT A

**PSA**

AGREEMENT OF PURCHASE AND SALE

Town & Country Apartments

By and Between

N. Neville Reid, not individually, but solely as Court-Appointed Chapter 11 Trustee for the

Bankruptcy Estate of Town and Country Partners LLC,

("Trustee")

and

Peerless Development, LLC

an Illinois Limited Liability Company

("Purchaser")

DATED:  March 30, 2022

## AGREEMENT OF PURCHASE AND SALE
## TOWN & COUNTRY APARTMENTS

THIS AGREEMENT OF PURCHASE AND SALE ("Agreement") is made and entered into this 30th day of March, 2022 by and between N. Neville Reid, not individually but solely as Trustee ("Trustee") appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430, and Peerless Development, LLC, an Illinois Limited Liability Company ("Purchaser").

### RECITALS

A.      Town and Country Partners LLC, an Illinois limited liability company ("Company" or the "Debtor") is the owner of two (2) non-contiguous parcels of real estate in Portage, Indiana, legally described on Exhibit A attached hereto (including all rights, privileges, easements and appurtenances to the Land owned by Debtor, the "Land") and all buildings thereon (collectively, the "Real Property", which together with the Personal Property (as hereinafter defined), the Leases, (as defined in Section 6.2 hereof) and the Intangible Property (as hereinafter defined), the Buildings (as hereinafter defined) and any and all structures, elevators, fixtures, parking areas and other improvements of any kind or nature collectively referred to herein as the "Property"), located at 2400 Dixie Drive, Portage, Indiana and 6021 Canden Avenue, Portage, Indiana and which together are commonly known as Town & Country Apartments. The Property includes one hundred (100) residential apartment units, contained within seventeen (17) buildings (the "Buildings"), as well as approximately 100 surface parking spaces and laundry facilities and the underlying parcels of land.

B.      Toorak Capital Partners, LLC ("Toorak") is the holder of a first mortgage lien encumbering the Property in the original principal amount of $7,280,000.00 (the "First Mortgage"), which First Mortgage was made by Debtor in favor of Triumph Capital Partner, LLC by instrument dated June 7, 2019 and recorded July 17, 2019 as Instrument No. 2019-014097 and assigned to Toorak by an assignment dated June 12, 2019 and recorded August 30, 2019 as Instrument No. 2019-018928, all in the Office of the Recorder of Porter County, Indiana.

C.      On July 14, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "Court"), Case No. 21-08430 (the "Chapter 11 Proceedings"), Pursuant to a certain "Order Granting U.S. Trustee's Motion to Approve the appointment of a Chapter 11 Trustee" [Docket No. 58] (the "Appointment Order") entered by the Court October 26, 2021, the Trustee (i) was appointed by the Court as Trustee for the chapter 11 bankruptcy estate of the Debtor and all of its assets (the "Bankruptcy Estate" or the "Estate", and such assets, the "Estate Assets"), and (ii) was authorized, among other things, to retain a broker and otherwise to take all necessary and reasonable actions to cause the sale or lease of all real property among the Estate Assets The Property is one of the Estate Assets.

D.      With the approval of the Court, Trustee has entered into an Exclusive Sales Listing Agreement with 33 Realty, in its capacity as broker ("Broker"), pursuant to which Broker was engaged to market the Property for sale. Broker has procured Purchaser to purchase the Property.

1

E.        Trustee, in his capacity as trustee, does not have legal title to the Property, but pursuant to the Appointment Order, has the authority, upon further Order of the Court, to enter into this Agreement on behalf of the Debtor's estate for the sale of the Property upon the terms and conditions set forth herein, including the express condition that such sale is subject to approval from the Court in the Chapter 11 Proceedings as more fully described herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Trustee and Purchaser agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

<u>Affiliate</u>. Any person or entity that directly, or indirectly, controls, is controlled by, or is under common control with, such a specified person or entity.

<u>Claim</u>.  Any action, assessment, loss, cause of action, claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expense of any nature, whether civil, criminal, administrative or otherwise, and includes any and all "claims" as defined in 11 U.S.C. Section 101(5), and all "interests" as used in 11 U.S.C. Section 363(f).

<u>Closing</u>.  The closing of the purchase and sale transaction contemplated herein.

<u>Closing Date</u>.  The earlier of: (i) the date which is five (5) business days after the order approving this Agreement becomes the Final Order (as defined in <u>Section 12</u>), (ii) April 29, 2022, and (iii) such sooner date as Purchaser and Trustee shall mutually agree, and as further approved by Toorak.

<u>Due Diligence Period</u>.  The period commencing on the date of this Agreement and ending at 5:00 p.m. (Chicago time) on March 17, 2022. The parties acknowledge that as of the date of this Agreement, the Due Diligence Period has expired as further set forth in Section 3.2(i) below.

<u>Encumbrances</u>. Means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

<u>Escrow Company</u>.  Chicago Title and Trust Company, 10 S. LaSalle Street, Suite 3100, Chicago, Illinois 60603, Attention: Krystina Cozzie, Phone No. (312) 223-2125, e-mail krystina.cozzie@ctt.com.

<u>Intangible Property</u>.  Collectively, all of the following (i) all guaranties and warranties, including guaranties and warranties pertaining to construction of the Buildings; (ii) all air rights, excess floor area rights and other development rights relating or appurtenant to the Real Property or the Buildings; (iii) all rights to obtain utility service in connection with the Buildings and the Real Property; (iv) assignable licenses and other governmental permits and permissions relating to the Real Property, the Building, and the operation

thereof; (v) all Designated Contracts (as hereinafter defined); and (vi) all trademarks and trade names.

<u>Liability</u>. Any unsatisfied debt, liability, obligation, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

<u>Lien</u>. Any lien (statutory or otherwise), encumbrance, Claim, indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, security interest, pledge, preference, option, lease, license, tax, right of first refusal or similar interest, title defect, easements, rights of way, restrictive covenant, encroachment, judgment, conditional sale, title retention agreement or restriction on transfer, or any other interest, whether it is secured or unsecured, known or unknown, recorded or unrecorded, contingent or liquidated.

<u>Personal Property</u>. All appliances furniture, fixtures, equipment, machinery, vehicles, carpet, drapes, and other personal and tangible property owned by Debtor now or hereafter attached to or appurtenant to the Land or used in connection with the Property.

<u>Title Company</u>. Chicago Title Insurance Company.

2.     <u>Sale; Purchase Price</u>.

2.1     Subject to the terms and provisions hereof, Trustee shall cause to be sold, assigned, transferred and conveyed unto Purchaser the Property, free and clear of all Liens, Claims and Encumbrances (other than Permitted Exceptions as defined below) as authorized by the Sale Order, and Purchaser shall purchase the Property, free and clear of all Liens, Claims and Encumbrances as authorized by the Sale Order.

2.2     The total purchase price (hereinafter called the "<u>Purchase Price</u>") for the Property shall be Nine Million One Hundred Sixty-Five Thousand and no/100 Dollars ($9,165,000.00). The Purchase Price shall be payable in the following manner:

(a)     <u>Earnest Money</u>. Purchaser shall, within two (2) business days after the full execution and delivery of this Agreement, deposit with the Escrow Company, as escrow agent, the amount of One Million and no/100 Dollars ($1,000,000.00) (the "<u>Earnest Money</u>") which Earnest Money shall be in the form of a wire transfer of immediately available United States of America funds. Subject to <u>Section 12</u> hereof, the Earnest Money shall be nonrefundable upon deposit with the Escrow Company unless this Agreement is terminated pursuant to any of the terms or conditions contained herein, in which event the refundability of the Earnest Money shall be governed by such terms or conditions. The Earnest Money shall be held and disbursed by the Escrow Company acting as escrow agent pursuant to the Earnest Money Escrow Agreement in the form of <u>Exhibit B</u> attached hereto which the parties have executed simultaneously with this Agreement. At Purchaser's election, the Earnest Money shall be deposited in an interest-bearing account or invested in such other deposits as shall be jointly agreed upon by Trustee and Purchaser. If the sale hereunder is consummated in accordance with the terms hereof, the Earnest Money shall

3

be applied to the Purchase Price to be paid by Purchaser at the Closing.  In the event of a default hereunder by Purchaser and provided Trustee is not in default hereunder, the Earnest Money shall be applied as provided herein.

(b)     Cash Balance.  Purchaser shall pay the balance of the Purchase Price, subject to the prorations described in Section 5 below, in cash (the "Cash Balance") by wire transfer of immediately available United States of America funds to the Escrow Company in accordance with the terms and conditions of this Agreement, so that the Escrow Company shall receive such payment no later than 1:00 pm (Chicago time) on the Closing Date.

(c)     Excluded Liabilities. Notwithstanding any other provision of this Agreement , Purchaser shall not assume, succeed to, be liable for, be subject to or be obligated for, nor shall the Property be subject to, any Liabilities of, and Claims, Liens, or Encumbrances against, the Trustee or Company or the Property, that Trustee or Company is, or could become, subject to or liable for, other than the Assumed Liabilities (collectively, the "Excluded Liabilities") including, without limitation: (i) any Liabilities relating to employees or contractors retained by the Trustee or Company and, its affiliates, contractors or agents in connection with the use and operation of the Property; (ii) any employee benefit plans of Company or any of its affiliates; (iii) all Liabilities for any taxes of Trustee or Company, other than taxes assumed by Purchaser pursuant to Section 5.5; (iv) all Liabilities and obligations of any kind or nature whatsoever first arising or existing prior to the Closing Date under the Designated Contracts, except for the Assumed Liabilities; (v) any and all Liabilities, Claims or Encumbrances based on facts, occurrences or conditions (A) first arising or existing prior to the Closing Date with respect to the Property, or (B) relating to or arising under any breach or violation of any environmental laws or licenses occurring prior to the Closing Date.

(d)     Assumed Liabilities.  Purchaser will not assume or in any way be responsible for any of the debts, Liabilities, or obligations of any kind or nature of the Trustee or Company; provided, however, that effective as of the close of business on the Closing Date, Purchaser will assume the Company's obligations under each assumed Designated Contracts in each case if and to the extent the status of each assumed agreements (the "Assumed Liabilities").

3.     Conditions Precedent.  In the event any of the conditions set forth in Sections 3.2(b), or 3.3 or Section 4.2 below shall not have been fulfilled, accepted or deemed accepted or waived as provided herein on or before the applicable dates specified herein, Trustee shall not be in default hereunder and shall have no liability as a result thereof, and Purchaser's sole right and remedy as a result thereof shall be the right to terminate this Agreement by giving written notice thereof to Trustee on or before the respective dates specified herein, and thereupon all Earnest Money shall be immediately refunded to Purchaser and neither party shall have any further rights or obligations hereunder, except for the Surviving Obligations (as hereinafter defined).

3.1     Trustee's Deliveries.  Trustee has delivered or made available to Purchaser complete copies of the items set forth on Schedule 3.1 hereto pertaining to the Property to the extent in Trustee's actual possession. In the event this Agreement terminates for any reason, Purchaser shall immediately return to Trustee all information delivered by Trustee or Trustee's agent(s) to Purchaser or Purchaser's agent(s).  The foregoing provision shall survive termination of this Agreement.

4

3.2      Due Diligence.  Purchaser and its representatives shall be permitted to enter upon the Property at any reasonable time and from time to time during the Due Diligence Period, to examine, inspect and investigate the Property as well as all records and other documentation provided by Trustee or located at the Property (collectively, "Due Diligence").  The Due Diligence shall be subject to the terms, conditions and limitations set forth in this Section 3.2, and Purchaser's conduct thereof shall be in strict compliance with its covenants and agreements contained herein.

(a)      Purchaser shall have a right to enter upon the Property for the purpose of conducting its Due Diligence provided that in each such instance (i) Purchaser notifies Trustee of its intent to enter the Property to conduct its Due Diligence not less than forty eight (48) hours prior to such entry; (ii) the date and approximate time period are scheduled with Trustee or his representative; and (iii) Purchaser is in full compliance with the insurance requirements set forth in Section 3.2(f) hereof.  At Trustee's election, a representative of Trustee shall be present during any entry by Purchaser or its representatives upon the Property for conducting its Due Diligence. Purchaser shall take all reasonably necessary actions to ensure that neither it nor any of its representatives interfere with the tenants or ongoing operations occurring at the Property. Purchaser shall not cause or permit any mechanics' liens, materialmen's liens or other liens to be filed against the Property as a result of its Due Diligence.

(b)      Purchaser shall have until the expiration of the Due Diligence Period to conduct its Due Diligence and, in Purchaser's sole discretion, to determine whether the Property is acceptable to Purchaser.  On or before the expiration of the Due Diligence Period, Purchaser shall deliver to Trustee written notice indicating whether Purchaser will proceed with the purchase of the Property in accordance with the terms and conditions of this Agreement.  If no such written notice is received by Trustee, Purchaser shall be deemed to have waived any further due diligence and elected to proceed with the purchase of the Property in accordance with solely the terms and conditions of this Agreement, the condition precedent set forth in this Section 3.2(b) shall be deemed satisfied and this Agreement shall continue in full force and effect.   In the event Purchaser's written notice to Trustee under this Section 3.2(b) indicates that Purchaser will not proceed with the purchase of the Property in accordance with the terms and conditions of this Agreement, this Agreement shall terminate, the Earnest Money shall be returned to Purchaser and neither party shall have any further obligations to the other party hereunder, except for the Surviving Obligations.

(c)      Purchaser shall, by written notice to Trustee prior to the Closing Date, designate which Service Contracts (as defined in Section 6.3 hereof) and Leases (as defined in Section 6.2 hereof), if any, Purchaser intends to be assigned to Purchaser (such Service Contracts and Leases being hereinafter collectively referred to as the "Designated Contracts"), and the Trustee shall maintain such Designated Contracts until the Closing Date; provided, however, that any cure amounts due and owing under such Designated Contracts shall be the sole responsibility of Purchaser.   As to any Designated Contract, as soon as practical after receiving the aforementioned notice from Purchaser, Trustee shall, subject to Purchaser's demonstrating adequate assurance of future performance, file a motion to seek assumption and assignment to Purchaser of such Designated Contracts pursuant to section 365 of the Bankruptcy Code (each, an "Assumption Motion"); provided, however, that, (i) if Purchaser desires to have any Assumption Motion heard at the hearing at which the Sale Motion is heard (the "Sale Hearing") and before the Closing, then Purchaser must identify any Designated Contracts that are the subject of any such Assumption Motion within 8 days before the Sale Hearing so that such Assumption Motion can

5

be filed within 7 days before the Sale Hearing, and (ii) any and all other Designated Contracts not addressed by an Assumption Motion heard at the Sale Hearing shall be disclosed to the Trustee by Purchaser within 14 days after the Closing Date (the "Post Sale Hearing Designated Contracts" and such disclosure the "Final Designated Contracts List").  The Trustee shall file an Assumption Motion as to all Post Sale Hearing Designated Contracts within 14 days after he receives the Final Designated Contracts List.  The Trustee may seek rejection pursuant to section 365 of any Lease or Service Contract that is not listed in an Assumption Motion before the Sale Hearing or is not listed on the Final Designated Contracts List.  The Purchaser shall have the right to remove any Designated Contract from the list of contracts or leases to be assumed at any time prior to entry of an order assuming and assigning contracts under this Agreement.

(d)    Purchaser shall have the right to conduct, at its sole cost and expense, any inspections, studies or tests that Purchaser deems appropriate in determining the condition of the Property, provided, however, Purchaser is not permitted to perform any sampling, boring, drilling or other physically intrusive testing into the structures or ground comprising the Property, including, without limitation, a Phase II environmental assessment, without (i) submitting to Trustee the scope and specifications for such testing; and (ii) obtaining the prior written consent of Trustee for such testing, which consent shall not be unreasonably withheld, conditioned or delayed.

(e)    Prior to Closing, Purchaser agrees and covenants with Trustee not to disclose to any third party (other than lenders, accountants, attorneys, investors and other professionals and consultants in connection with the transaction contemplated herein) without Trustee's prior written consent, unless Purchaser is obligated by law to make such disclosure, any of the reports or any other documentation or information obtained by Purchaser which relate to the Property or Trustee in any way, all of which shall be used by Purchaser and its agents solely in connection with the transaction contemplated hereby.  In the event that this Agreement is terminated, Purchaser agrees that all such information will continue to be held in strict confidence.

(f)    Purchaser agrees to indemnify, protect, defend and hold Trustee,  and each of his attorneys, employees, agents and other representatives (collectively, "Representatives"), and each of their respective direct and indirect partners, trustees, beneficiaries, shareholders, members, managers, officers, directors, employees, advisors and other agents (collectively, including the Representatives, the "Indemnified Parties") harmless from and against any and all actual liabilities, demands, actions, causes of action, suits, claims, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees, court costs and litigation expenses) actually suffered or incurred by any of the Indemnified Parties as a result of or in connection with any activities of Purchaser (including activities of any of Purchaser's employees, consultants, contractors or other agents) relating to the Property, including, without limitation, mechanics' liens, damage to the Property, and injury to persons or property resulting from such activities in connection therewith.  Notwithstanding the foregoing, Purchaser's indemnification obligations under this Section 3.2(f) shall not extend to any preexisting conditions merely found to exist by Purchaser (except to the extent that the actions of Purchaser or its representatives have exacerbated the same), or the gross negligence or willful misconduct of the Indemnified Parties.  In the event that the Property is disturbed or altered in any way as a result of such activities, Purchaser shall promptly restore the Property to its condition existing prior to the commencement of such activities which disturbed or altered the Property.  Furthermore, Purchaser agrees to maintain and cause any of its representatives or agents conducting any Due Diligence to

maintain and have in effect commercial general liability insurance with (i) limits of not less than Two Million and 00/100 Dollars ($2,000,000.00) per occurrence for personal injury, including bodily injury and death, and property damage, (ii) Trustee and each of his Representatives named as an additional insured party, and (iii) waiver of subrogation.  Purchaser shall deliver to Trustee a copy of the certificates of insurance effectuating the insurance required hereunder prior to the commencement of such activities which certificates shall provide that such insurance shall not be terminated or modified without at least thirty (30) days' prior written notice to Trustee.

(g)    Purchaser acknowledges and agrees that it shall have no right to review or inspect any of the following: (i) internal memoranda, correspondence, analyses, documents or reports prepared by or for Trustee in connection with (A) this Agreement, or (B) the transaction contemplated by this Agreement, and (ii) appraisals or other valuations of the Property in the possession of Trustee.

(h)    Sections 3.2(e) and 3.2(f) and such other provisions in this Agreement designated as expressly surviving the termination hereof shall survive the termination of this Agreement (collectively, the "Surviving Obligations").

(i)    As of the date of this Agreement, and notwithstanding anything herein to the contrary, the parties acknowledge and agree that the Due Diligence Period has expired.  For the avoidance of doubt, Purchaser hereby waives Due Diligence and any further due diligence and confirms that it has elected to proceed with the purchase of the Property in accordance with the remaining terms and conditions of this Agreement.  All references in this Agreement to "Due Diligence" and the "Diligence Period" shall have no further applicability.  Trustee hereby confirms receipt of Purchaser's title and survey objection letter dated March 17, 2022, and Trustee further confirms his intent to cure such objections on or before the Closing Date as further set forth in Section 3.3.

3.3    Title and Survey.    Trustee has obtained and delivered to Purchaser for Purchaser's review the Title Commitment and the Survey described in Schedule 3.1 hereto.  Prior to the Closing Date, Purchaser shall have the right to obtain, at its sole cost and expense, any desired endorsements to the Title Commitment which are available, provided that Purchaser's obtaining of such endorsements shall not be considered a condition to the Closing.  Purchaser shall have until the expiration of the Due Diligence Period for examination of the Title Commitment and Survey and the making of any objections thereto, said objections to be made in writing and delivered to Trustee on or before the expiration of the Due Diligence Period.  If Purchaser shall fail to make any objections on or before the expiration of the Due Diligence Period, Purchaser shall be deemed to have accepted all exceptions to the Title Commitment and the form and substance of the Survey and all matters shown thereon; all such exceptions and matters and any exceptions or matters caused by or through Purchaser shall be included in the term "Permitted Exceptions" as used herein; provided, however, under no circumstances shall Permitted Exceptions include financing statements, liens secured by mortgages, mechanics' liens, judgment liens, delinquent taxes, any security interests, and monetary liens or encumbrances whether or not Purchaser objects to same in writing or unless expressly agreed to in writing by Purchaser.  If any objections to the Title Commitment or Survey are made on or before the expiration of the Due Diligence Period, then Trustee shall have the right, but not the obligation, to (A) cure (by removal, endorsement or otherwise) such objections on or before the Closing Date, or (B) terminate this Agreement by giving notice to Purchaser on or before the date which is ten (10) days after

Trustee's receipt of Purchaser's notice of objections to the Title Commitment or Survey (as applicable).  If no such notice from Trustee concerning such election is received by Purchaser by such date, then Trustee shall be deemed to have elected not to cure any such objections. If this Agreement is not so terminated by Trustee, and any such objections are not cured by Trustee by the then scheduled Closing Date, then Purchaser may as its only option, elect to either:  (y) waive such objection(s) and consummate the transaction contemplated by this Agreement without adjustment to the Purchase Price; or (z) within five (5) days of the Closing Date, send Trustee a written notice to terminate this Agreement (and failure of Purchaser to send such written notice shall constitute a waiver of such right to terminate), in which event the Earnest Money shall be returned to Purchaser and neither party shall have any further obligations to the other party except for the Surviving Obligations.

4.      Closing; Conditions; Deliveries.

        4.1      Place of Closing.  The Closing shall be held on the Closing Date through an escrow arrangement established with the Escrow Company.

        4.2      Condition to Parties' Obligation to Close.  In addition to all other conditions set forth in this Agreement, the obligation of Trustee, on the one hand, and Purchaser, on the other hand, to consummate the transaction contemplated hereunder shall be contingent upon the following:

                (a)      The other party's representations and warranties contained herein shall be true and correct in all material respects as of the date of this Agreement and the Closing Date;

                (b)      As of the Closing Date, the other party shall have performed its obligations hereunder in all material respects and all deliveries to be made at Closing by such other party have been tendered;

                (c)      As of the Closing Date, there shall exist no pending action, suit or proceeding with respect to the other party filed by a third party unrelated to the parties to this Agreement before or by any court or administrative agency which seeks to restrain or prohibit, or to obtain damages or a discovery order with respect to, this Agreement or the consummation of the transactions contemplated hereby; and

                (d)      As of the Closing Date, the Title Company shall be prepared to deliver to Purchaser an initialed mark-up of the Title Commitment or signed owner's pro forma title policy, extending the effective date to the Closing Date, insuring Purchaser as owner of the Real Property, and removing all exceptions other than Permitted Exceptions.

                (e)      Sale Order. The Bankruptcy Court has entered a final non-appealable Sale Order (as defined below) in a form acceptable to Purchaser, approving the sale of the Property to Purchaser free and clear of all Liens, Claims and Encumbrances and, as of Closing, the Sale Order remains in full force and effect, and has not been stayed, vacated, reversed, or modified.

        4.3      Deliveries.  At Closing each party shall execute and deliver to the other and/or the Escrow Company the following documents:

                (a)      Trustee shall deliver to Purchaser and/or the Escrow Company:

(i)       a quitclaim deed (the "Deed") to the Property in recordable form, duly executed by Trustee and acknowledged and in substantially the same form as set forth in Exhibit C attached hereto, conveying to Purchaser all of the Bankruptcy Estate's and the Company's right, title and interest in and to the Real Property, subject to the Permitted Exceptions and otherwise on a strictly "as is, where is" basis with no representations or warranties by Trustee or his Representatives whatsoever, other than as expressly set forth herein;

(ii)      a bill of sale duly executed by Trustee and in substantially the same form as set forth in Exhibit D attached hereto, conveying to Purchaser free and clear of all Liens, Claims and Encumbrances all of the Bankruptcy Estate's and the Company's right, title and interest in and to the personal property located at the Real Property as of the date hereof to Purchaser, if any, on a strictly "as is, where is" basis with no representations or warranties by Trustee or his Representatives whatsoever, other than as expressly set forth herein;

(iii)     originals of all Designated Contracts (or, to the extent originals are not available, copies) to the extent not otherwise already made available to Purchaser;

(iv)      an assignment to Purchaser of the Designated Contracts which are the subject of an Assumption Motion heard and approved by the Court at the Sale Hearing, duly executed by Trustee and in substantially the same form as set forth in Exhibit E attached hereto;

(v)       a n assignment to Purchaser of the licenses and permits and Intangible Property affecting the Property (to the extent freely assignable), duly executed by Trustee and in substantially the same form as set forth in Exhibit F attached hereto;

(vi)      a non-foreign transferor certification pursuant to Section 1445 of the Internal Revenue Code and any similar provisions of applicable state law, in substantially the same form as set forth on Exhibit G attached hereto;

(vii)     a copy of the Final Order, which shall be in form reasonably acceptable to the Purchaser, the Title Company and Toorak;

(viii)    such evidence as may be reasonably required by Title Company confirming that the Trustee has the power, right and authority to consummate the sale of the Property in accordance with the terms hereof;

(ix)      a release executed by Toorak, in recordable form, releasing its First Mortgage, or, if acceptable to the Title Company, a payoff letter from Toorak indicating the amount required by Toorak to pay off the First Mortgage (and which payoff shall be made from the proceeds of sale); and

(x)       originals (or copies to the extent that originals are not available to Trustee) of the Leases and keys to the Property.

(b)      Purchaser shall deliver to Trustee or the Escrow Company:

(i)       the Cash Balance, by wire transfer, as provided in Section 2.2(b) hereof;

9

(ii)        an assumption duly executed by the Purchaser of the assignments described in <u>Section 4.3(a)(iv) and (v)</u>; and

(iii)        such evidence as may be reasonably required by Title Company confirming that Purchaser has the power, right and authority to consummate the purchase of the Property.

(c)        Trustee and Purchaser shall jointly deliver to the Escrow Company:

(i)        A closing statement;

(ii)        All transfer declarations or similar documentation required by law, if any;

(iii)        A letter to the tenants of the Property in the form of <u>Exhibit H</u> attached hereto; and

(iv)        Notices in substantially the form of <u>Exhibit I</u> attached hereto to the other party to each Service Contract assumed by Purchaser pursuant to <u>Section 3.2(c)</u> of this Agreement.

4.4    <u>Permitted Termination</u>.  So long as a party is not in default hereunder, if any condition to such party's obligation to proceed with the Closing hereunder has not been satisfied in all material respects or waived as of the Closing Date or such earlier date as provided herein, such party may, in its sole discretion, terminate this Agreement by delivering written notice to the other party before the Closing Date or such earlier date required hereunder, or elect to close, notwithstanding the non-satisfaction of such condition, in which event such party shall be deemed to have waived any such condition.

5.    <u>Prorations</u>.  All items of income and expense shall be paid, prorated or adjusted as of 11:59 p.m. prevailing Chicago time on the day prior to the Closing Date (the "<u>Proration Date</u>"), with Purchaser deemed the owner of the Property on the entire Closing Date, in the manner hereinafter set forth:

5.1    Purchaser shall be credited with (i) the amount of all rents received by Trustee and attributable to the period commencing on the Closing Date, (ii) all unapplied refundable cash security deposits held by Trustee and which were made by tenants under all Leases in effect as of the Closing Date, together with all accrued interest thereon, if any, and (iii) all prepaid security deposits held by Trustee for Leases whose terms have not commenced as of the Closing Date, together with all accrued interest thereon, if any.

5.2    All collected rents for the month of Closing shall be prorated between Purchaser and Trustee based upon the respective days of ownership for such month in which the Closing occurs and as set forth in <u>Section 5.3</u>.

5.3    For purposes of this Agreement, any rentals shall be deemed delinquent when payment thereof is due prior to the Closing Date, but has not been made as of the Closing Date ("<u>Delinquent Rentals</u>").  To the extent either Trustee or Purchaser collects any Delinquent Rentals after the Closing Date, such Delinquent Rentals shall be first applied to any accrued but unpaid

rental obligations of the tenants for the period after the Closing Date and the balance, if any, shall be paid to Trustee and credited against any Delinquent Rentals relating to the period prior to the Closing Date (collectively, "Seller's Rentals").  Notwithstanding any of the foregoing, to the extent any rentals due for the calendar month in which Closing occurs are received by Trustee or Purchaser after the Closing Date but prior to the first (1st) day of the calendar month following the calendar month in which Closing occurs, the parties hereby agree the party who received said rentals shall prorate the same and remit to the other party, within five (5) business day thereafter, said party's prorated portion.  After the Closing Date, Trustee shall not institute any new actions against any tenants for delinquent rent or otherwise, but Trustee shall be permitted to continue to pursue after the Closing Date any eviction proceedings against delinquent tenants which were commenced prior to the Closing Date.   Purchaser agrees to diligently pursue collections from tenants relating to periods prior to the Closing Date.  Any rents or payments received after the Closing Date by the Trustee, Company, or any property manager hired by any of them shall be held in trust for the benefit of the Purchaser and shall not become property of the Debtor's Bankruptcy estate.

5.4     Operating expenses, including, without limitation, any prepaid expenses such as permits and licenses, shall be prorated between Purchaser and Trustee based upon the actual days of respective ownership of the Property utilizing the actual expenses or reasonable estimates.

5.5     Except as provided in the following sentence, all real estate taxes and assessments ("Taxes") which are either delinquent or currently due and payable as of the Closing Date shall be paid by Trustee at or before Closing, and Trustee shall be charged with and shall pay at Closing any interest, penalties or other fees related to any such Taxes.  Taxes which have accrued as of the Proration Date which are not then due and payable shall be prorated between Trustee and Purchaser based upon the actual days of ownership (meaning, in the case of Trustee, the period of Company's ownership prior to Trustee's conveyance of the Property to Purchaser) for the year in which Closing occurs and based upon 102% of the most recent ascertainable tax bill(s).  Trustee shall retain all rights with respect to any refund of taxes applicable to any period prior to the Closing Date.  All real estate tax prorations shall be final.

5.6     Except for utilities billed directly to tenants, utilities shall be prorated as of the Proration Date based upon estimates using the prior month's actual invoices.

5.7     All insurance policies and property management agreements shall be terminated as of the Closing Date and there shall be no proration with respect to these items. Purchaser shall have no responsibility or Liability with respect to any property management agreements, whether written or oral, entered into or on behalf of  the Trustee or the Company or any of its Affiliates.

All other items which are customarily prorated in transactions similar to the transaction contemplated hereby and which were not heretofore dealt with, will be prorated as of the Proration Date.  In the event any prorations or computations made under this Section 5 are based on estimates or prove to be incorrect, then either party shall be entitled to an adjustment to correct the same, provided that it makes written demand on the party from whom it is entitled to such adjustment within one hundred and twenty (120) days after the end of the calendar year in which the Closing occurs (other than in connection with the proration of Taxes which shall be final).

6.      Trustee 's Representations.  Trustee hereby represents to Purchaser on the date hereof and the Closing Date as follows:

6.1      Power.  Trustee has full capacity, right, power and authority to enter into this Agreement and subject to satisfaction of the Court Approval Contingency (as hereinafter defined) and entry of the Final Order by the Court, to perform its obligations hereunder.

6.2      Leases.  As of the date hereof, to Trustee's actual knowledge, Schedule 6.2 hereto is a complete and accurate list of the tenants under apartment leases (the "Leases") at the Property as of the date of this Agreement, which schedule shall be updated by Trustee prior to Closing, if necessary, to include new tenants and delete terminated tenants.

6.3      Service Contracts.  As of the date hereof, to Trustee's actual knowledge, Schedule 6.3 hereto is a complete and accurate list of the service, utility, and management contracts, equipment leases, and other contracts in connection with the operation of the Property (the "Service Contracts") as of the date of this Agreement, which schedule shall be updated by Trustee prior to Closing, if necessary, to include new Service Contracts and delete terminated Service Contracts.

6.4      Notices.  To Trustee's actual knowledge and except as otherwise set forth in Schedule 6.4 hereof, Trustee has received no written notices or has actual notice of any  of a violation relating to the Property of any law, rule, regulation ordinance or other requirement from any governmental or regulatory authority.

6.5      Litigation.  To Trustee's actual knowledge, there is no litigation, governmental or administrative proceedings or arbitration presently pending or threatened in writing with respect to the Company, Property or Land, except with respect to the Bankruptcy Case and except for the foreclosure action filed by Toorak in the Porter County, Indiana Circuit Court captioned *Toorak Capital Partners, LLC v. Town and Country Partners, LLC, et al.*, Case No. 64D02-2003-MF-002648 .

6.6.      All Work Completed.  To Trustee's actual knowledge, all work being performed at the Property has been completed and paid for.

As used in this Section 6 and for all other purposes of this Agreement, the term "to Trustee's actual knowledge" or words of similar import (i) shall mean the actual knowledge of N. Neville Reid only and not of any other persons, (ii) shall mean the actual knowledge of N. Neville Reid, without any investigation or inquiry of any kind, and (iii) shall not mean that N. Neville Reid is charged with knowledge of the acts, omissions and/or knowledge of Trustee's agents or employees or any of his other Representatives.

7.      Purchase As-Is.  EXCEPT FOR THE REPRESENTATIONS OF TRUSTEE EXPRESSLY SET FORTH IN SECTION 6 OF THIS AGREEMENT, PURCHASER WARRANTS AND ACKNOWLEDGES TO AND AGREES WITH TRUSTEE THAT PURCHASER IS PURCHASING THE PROPERTY IN ITS "AS-IS, WHERE IS" CONDITION "WITH ALL FAULTS" AND DEFECTS AS OF THE CLOSING DATE AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS  OR IMPLIED, AS TO ITS CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY,  OR ANY OTHER WARRANTY OF ANY

12

KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF TRUSTEE. EXCEPT FOR THE REPRESENTATIONS OF TRUSTEE EXPRESSLY SET FORTH IN SECTION 6 OF THIS AGREEMENT, TRUSTEE SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, STRUCTURAL INTEGRITY, SOIL AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, INCLUDING THE POSSIBILITIES FOR FUTURE DEVELOPMENT OF THE PROPERTY; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (H) THE PRESENCE OR ABSENCE OF MOLD OR OTHER BACTERIAL MATTER, RADON OR ANY HAZARDOUS MATERIALS AT, ON, UNDER, OR ADJACENT TO THE PROPERTY OR ANY OTHER ENVIRONMENTAL MATTER OR CONDITION OF THE PROPERTY; OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS OF TRUSTEE CONTAINED IN SECTION 6 OF THIS AGREEMENT, ANY INFORMATION PROVIDED BY OR ON BEHALF OF TRUSTEE WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT TRUSTEE HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. TRUSTEE IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON EXCEPT FOR THE EXPRESS REPRESENTATIONS SET FORTH IN SECTION 6 OF THIS AGREEMENT. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER IS A SOPHISTICATED AND EXPERIENCED PURCHASER OF PROPERTIES SUCH AS THE PROPERTY AND HAS BEEN DULY REPRESENTED BY COUNSEL IN CONNECTION WITH THE NEGOTIATION OF THIS AGREEMENT. TRUSTEE HAS MADE NO AGREEMENT TO ALTER, REPAIR OR IMPROVE ANY OF THE PROPERTY.

UPON CLOSING, EXCEPT FOR THE REPRESENTATIONS OF TRUSTEE EXPRESSLY SET FORTH IN SECTION 6 OF THIS AGREEMENT, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL OR CONSTRUCTION DEFECTS OR ADVERSE ENVIRONMENTAL, HEALTH OR SAFETY CONDITIONS MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS, AND PURCHASER HEREBY FOREVER RELEASES AND DISCHARGES TRUSTEE FROM ALL RESPONSIBILITY AND LIABILITY, INCLUDING WITHOUT LIMITATION, LIABILITIES AND RESPONSIBILITIES FOR TRUSTEE'S OBLIGATIONS UNDER THE LEASES RELATING

TO THE PHYSICAL, ENVIRONMENTAL OR LEGAL COMPLIANCE STATUS OF THE PROPERTY, WHETHER ARISING BEFORE OR AFTER THE DATE HEREOF, AND LIABILITIES UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT ("CERCLA"), REGARDING THE CONDITION, VALUATION, SALABILITY OR UTILITY OF THE PROPERTY, OR ITS SUITABILITY FOR ANY PURPOSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, WITH RESPECT TO THE PRESENCE IN THE SOIL, AIR, STRUCTURES AND SURFACE AND SUBSURFACE WATERS, OF HAZARDOUS MATERIALS OR OTHER MATERIALS OR SUBSTANCES THAT HAVE BEEN OR MAY IN THE FUTURE BE DETERMINED TO BE TOXIC, HAZARDOUS, UNDESIRABLE OR SUBJECT TO REGULATION AND THAT MAY NEED TO BE SPECIALLY TREATED, HANDLED AND/OR REMOVED FROM THE PROPERTY UNDER CURRENT OR FUTURE FEDERAL, STATE AND LOCAL LAWS, REGULATIONS OR GUIDELINES, AND ANY STRUCTURAL AND GEOLOGIC CONDITIONS, SUBSURFACE SOIL AND WATER CONDITIONS AND SOLID AND HAZARDOUS WASTE AND HAZARDOUS MATERIALS ON, UNDER, ADJACENT TO OR OTHERWISE AFFECTING THE PROPERTY). PURCHASER FURTHER HEREBY WAIVES (AND BY CLOSING THIS TRANSACTION WILL BE DEEMED TO HAVE WAIVED) ANY AND ALL OBJECTIONS AND COMPLAINTS (INCLUDING, BUT NOT LIMITED TO, FEDERAL, STATE AND LOCAL STATUTORY AND COMMON LAW BASED ACTIONS, AND ANY PRIVATE RIGHT OF ACTION UNDER ANY FEDERAL, STATE OR LOCAL LAWS, REGULATIONS OR GUIDELINES TO WHICH THE PROPERTY IS OR MAY BE SUBJECT, INCLUDING, BUT NOT LIMITED TO, CERCLA) CONCERNING THE PHYSICAL CHARACTERISTICS AND ANY EXISTING CONDITIONS OF THE PROPERTY, INCLUDING WITHOUT LIMITATION, TRUSTEE'S OBLIGATIONS UNDER THE LEASES RELATING TO THE PHYSICAL, ENVIRONMENTAL OR LEGAL COMPLIANCE STATUS OF THE PROPERTY, WHETHER ARISING BEFORE OR AFTER THE DATE HEREOF.

8.    Purchaser's Representations.  Purchaser hereby represents to Trustee as follows:

8.1    Power.  Purchaser has full capacity, right, power, ability, financial wherewithal and authority to execute, deliver and perform this Agreement and all documents to be executed by Purchaser under this Agreement.  Without limiting the generality of the foregoing and notwithstanding any other provision hereof to the contrary, Purchaser specifically represents and warrants to Trustee that it has the financial wherewithal and other means to perform its obligations hereunder, including without limitation its obligation to pay the Purchase Price on or before the Closing Date, irrespective of whether Purchaser has or obtains any commitment from any entity to provide funds to Purchaser on or after the Closing Date for any purpose or reason related to the Property or Purchaser's acquisition thereof. Purchaser acknowledges and agrees that Trustee is materially relying on this representation in entering into this Agreement.

8.2    Requisite Action.  All requisite action (corporate, trust, partnership or otherwise) has been taken by Purchaser in connection with entering into this Agreement and the instruments referenced herein and the consummation of the transactions contemplated hereby.  No consent of any partner, shareholder, member, creditor, investor, judicial or administrative body, authority or other party is required which has not been obtained or shall not be obtained prior to the expiration of the Due Diligence Period to permit Purchaser to enter into this Agreement and consummate the transaction contemplated hereby.

8.3    Authority.    The individuals executing this Agreement and the instruments referenced herein on behalf of Purchaser have the legal power, right and actual authority to bind Purchaser to the terms and conditions hereof and thereof.

8.4    Validity.   This Agreement and all documents required hereby to be executed by Purchaser are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

8.5    Conflicts.   Neither the execution and delivery of this Agreement and documents referenced herein, nor the incurrence of the obligations set forth herein, nor the consummation of the transactions herein contemplated, nor referenced herein conflict with or result in the material breach of any terms, conditions or provisions of or constitute a default under, any bond, note, or other evidence of indebtedness or any contract, lease or other agreements or instruments to which Purchaser is a party.

8.6    Litigation.   There is no action, suit or proceeding pending or threatened against Purchaser in any court or by or before any other governmental agency or instrumentality which would materially and adversely affect the ability of Purchaser to carry out the transactions contemplated by this Agreement.

8.7    OFAC.   Neither Purchaser nor any person or entity that directly or, to Purchaser's knowledge, indirectly owns an interest in Purchaser, nor any of its officers, directors or managing members, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action. Purchaser's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder.  None of the funds of Purchaser have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in Purchaser is prohibited by law or that the transaction or this Agreement is or will be in violation of law.

8.8    No Relationship with Debtor or Affiliates.   Neither Purchaser nor any partner, officer, member, employee, shareholder or other affiliate of Purchaser (collectively, the "Purchaser Parties") has any relationship with or interest in the Debtor or with or in any officer, member, partner, employee, shareholder or other affiliate of the Debtor (including without limitation Pinnacle Asset Management; collectively, the "Debtor Parties").  None of the Debtor Parties will acquire any interest in any Purchaser Party as a result of the Closing, nor does any Purchaser Party have any agreement with any Debtor Party to convey or transfer to any Debtor Party any proceeds from or any interest in the Property while the Property is owned by any Purchaser Party.

9.    Closing Costs.  Trustee shall pay the following expenses:  (i) the costs to obtain a base ALTA owner's title policy, including extended coverage but only to the extent the Existing Survey will support the issuance of extended coverage; (ii) the costs of the Survey; (iii) 50% of all closing escrow fees, including "New York Style" closing fees; and (iv) Trustee's legal fees and expenses. Purchaser shall pay the following expenses: (a) the costs for any endorsements to the title policy;

(b) the cost of any reinsurance of the title policy; (c) the costs of any revisions or additional information required by Purchaser to be added to the Survey; (d) 50% of all closing escrow fees, including "New York Style" closing fees; (e) the fee for the recording of the Deed; (f) all costs and expenses incurred in connection with the transfer of any transferable permits, warranties or licenses in connection with the ownership or operation of the Property; (g) all costs and expenses associated with Purchaser's financing, if any (provided that Purchaser's financing shall not be a condition to closing); and (h) Purchaser's legal fees and expenses.  The provisions of this Section 9 shall survive Closing or any termination of this Agreement.

10.    Commissions.  Trustee shall be solely responsible for the payment of the commission to Broker.  Trustee and Purchaser each warrant and represent to the other that (other than Broker) neither has had any dealings with any broker, agent, or finder relating to the sale of the Property or the transactions contemplated hereby, and each agrees to indemnify and hold the other harmless against any claim for brokerage commissions, compensation or fees by any broker, agent, or finder in connection with the sale of the Property or the transactions contemplated hereby resulting from the acts of the indemnifying party.  The provisions of this Section 10 shall survive Closing or any termination of this Agreement.

11.    New York Style Closing.  It is contemplated that the transaction shall be closed by means of a so-called New York Style Closing, with the concurrent delivery of the documents of title, transfer of interest, delivery of the title policy or marked-up title commitment described in Section 4.2(d) and the payment of the Purchase Price.  Trustee and Purchaser agree to use reasonable efforts to complete all requirements for Closing prior to the Closing Date.  Trustee and Purchaser also agree that disbursement of the Purchase Price, as adjusted by the prorations, shall not be conditioned upon the recording of the Deed, but rather, upon the agreement by the Title Company to issue the title policy.  Trustee and Purchaser shall each provide any undertaking to the Title Company reasonably necessary to accommodate the New York Style Closing.

12.    Court Approval Contingency.  This Agreement and the obligations of the Trustee to consummate the transaction described in this Agreement are expressly subject to and conditioned upon approval of the Court in the Chapter 11 Proceedings to all of the terms and conditions set forth herein (such condition being referred to as the "Court Approval Contingency").  Promptly following the full execution and delivery of this Agreement, but in no event more than three (3) business days following the full execution and delivery of this Agreement, the Trustee will file a motion seeking approval of this Agreement and the conveyance of the Property by the Trustee to Purchaser as set forth in this Agreement (the "Sale Motion").  The Sale Motion shall seek entry of an order (the "Sale Order") reasonably acceptable to the parties, the Title Company and Toorak, providing for among other things that (i) the Trustee has authority to sell the Property, (ii) the sale of the Property to Purchaser shall be free and clear of all Liens, Claims and Encumbrances, (iii) Purchaser is a "good faith purchaser" for purposes of Section 363(m) of the Bankruptcy Code, (iv) the 14-day appeal period in the Federal Rules of Bankruptcy Procedure are waived, and otherwise being in substantially the form attached hereto as Exhibit J; (v) findings that all applicable notice and hearing requirements for the transactions contemplated herein under the Bankruptcy Code, the Bankruptcy Rules, and any local rules of the Bankruptcy Court have been satisfied, (vi) finding that the transactions contemplated hereby are in the best interests of the Debtor's estate and its creditors, and (vii) approves this Agreement and all of the terms and conditions hereof, or on such other terms as the parties may agree in writing.  Upon the Sale Order becoming final and non-appealable, including by virtue of expiration of the 14-day appeal period applicable thereto under

the Federal Rules of Bankruptcy Procedure, or in the event the Court waives or shortens such 14 day appeal period, by written agreement of the parties after the entry of the Sale Order, it shall be a "Final Order". If the Sale Motion is denied by the Court or the Trustee is otherwise unable to obtain the Final Order within 30 days after the filing of the Sale Motion or such other time period as Trustee, Purchaser and Toorak, may agree, then such denial shall not be deemed to be a default by the Trustee under this Agreement, but rather the failure of a condition precedent, and in such event, either Purchaser or the Trustee thereafter shall have the right to terminate this Agreement at any time thereafter by delivering written notice of said termination to the other party. Upon termination as set forth in this Section 12, the Earnest Money will be immediately returned to Purchaser and, except as to the Surviving Obligations, neither the Trustee nor Purchaser shall have any further rights or liability occurring hereunder after said termination. In the event the Court enters an order authorizing the sale of the Property to anyone other than Purchaser, such sale closes, and the Trustee is not otherwise entitled to retain the Earnest Money pursuant to Section 17(b) hereof, then, notwithstanding anything to the contrary herein, the Earnest Money shall be immediately returned to Purchaser.

13.     Notice. Except as may be otherwise provided in this Agreement, all notices, demands, requests or other communications required or permitted to be given under this Agreement must be delivered to the following addresses (i) personally, by hand delivery; (ii) by Federal Express or a similar internationally recognized overnight courier service; or (iii) by email or fax transmission, provided that proof of successful transmission is furnished by the party requesting same. All such notices, demands, requests or other communications shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a business day or is required to be delivered on or before a specific day which is not a business day, the day of receipt or required delivery shall automatically be extended to the next business day.

If to Trustee:                     N. Neville Reid
                                   c/o Fox Swibel Levin & Carroll LLP
                                   200 West Madison Street, Suite 3000
                                   Chicago, Illinois 60606
                                   nnreid@foxswibel.com
                                   Facsimile No. 312.224.1201


With copies to:                    Fox, Swibel, Levin Carroll, LLP
                                   200 West Madison, Suite 3000
                                   Chicago, Illinois 60606
                                   Attention: Ryan Schultz
                                   rschultz@foxswibel.com
                                   Facsimile No. 312.224.1201


Notices to Purchaser:              c/o Michael Shenouda
                                   1038 North Ashland Avenue
                                   Chicago, Illinois 60622


With copies to:                    Much Shelist, P.C.
                                   191 North Wacker Drive, Suite 1800

17

Chicago, Illinois 60606
Attention: Courtney E. Mayster
cmayster@muchlaw.com
Facsimile No. 312.521.2100

14.   <u>Fire or Other Casualty; Condemnation</u>.

14.1   If the Property or any part thereof is damaged by fire or other casualty prior to the Closing Date which would cost in excess of $1,000,000.00 to repair (as determined by an insurance adjuster selected by the insurance carriers), Purchaser may terminate this Agreement by written notice to Trustee given on or before the earlier of (i) twenty (20) days following such casualty or (ii) the Closing Date. In the event of such termination, this Agreement shall be of no further force and effect and, except for the Surviving Obligations, neither party shall thereafter have any further obligation under this Agreement, and Trustee shall direct the Escrow Company to promptly return all Earnest Money to Purchaser. If Purchaser does not elect to terminate this Agreement or the cost of repair is determined by said adjuster to be less than $1,000,000.00, then the Closing shall take place as herein provided without abatement of the Purchase Price, and Trustee shall assign and transfer to Purchaser on the Closing Date, without warranty or recourse, all of Trustee's right, title and interest to the balance of insurance proceeds paid or payable to Trustee on account of such fire or casualty remaining after reimbursement to Trustee for the total amount of all costs and expenses incurred by Trustee in connection therewith including but not limited to making emergency repairs, securing the Property and complying with applicable governmental requirements. Trustee shall pay to Purchaser the amount of the deductible of any of Trustee's applicable insurance policies.

14.2   If any material portion of the Property is taken in eminent domain proceedings prior to Closing, Purchaser may terminate this Agreement by notice to Trustee given on or before the earlier of (i) twenty (20) days after such taking or (ii) the Closing Date, and, in the event of such termination, this Agreement shall be of no further force and effect and, except for the Surviving Obligations, neither party shall thereafter have any further obligation under this Agreement, and Trustee shall direct the Escrow Company to promptly return all Earnest Money to Purchaser. If Purchaser does not so elect to terminate or if the taking is not material, then the Closing shall take place as herein provided without abatement of the Purchase Price, and Trustee shall deliver or assign to Purchaser on the Closing Date, without warranty or recourse, all of Trustee's right, title and interest in and to all condemnation awards paid or payable to Trustee.

15.   <u>Operations After Date of This Agreement</u>. Trustee covenants and agrees with Purchaser that after the date hereof through the Closing, Trustee will (except as specifically provided to the contrary herein or as Purchaser may otherwise consent in writing):

(i)   Refrain from causing a transfer of the Property or the creation on the Property of any easements or mortgages which will survive Closing or permitting any changes to the zoning classification of the Land;

(ii)   Refrain from entering into or amending any contracts, or other agreements (excluding leases) regarding the Property (other than contracts in the ordinary and usual course of business and which are cancelable by the owner of the Property without penalty within thirty (30) days after giving notice thereof);

18

(iii)    Continue to operate, maintain, and repair the Property in a manner consistent with Trustee's current practices, it being understood and agreed that (a) the Property, including any vacant units therein, shall be delivered at Closing on a strictly as is, where is basis,  (b) Purchaser shall not be entitled to require that any improvements or repairs or other alterations be made to any unit on the Property or to any other aspect of the Property whatsoever on or before the Closing Date as a condition of its obligation hereunder to purchase the Property on the Closing Date, and (c) neither this Section 15(iii) nor any other provision hereof shall be construed as any requirement that Trustee maintain any specific level of occupancy at the Property as a condition of Purchaser's obligation to purchase the Property pursuant to the terms hereof;

(iv)    Refrain from offering the Property for sale or marketing the same, except that Trustee and his Representatives may within their discretion secure a back-up offer or bidder at any time for purchase of the Property to cover the risk that Purchaser fails to close the purchase of the Property as required hereunder;

(v)    Comply with the material terms of the Leases;

(vi)    Enter into new Leases only on market terms; and

(vii)    Deliver or make available to Purchaser copies of all new Leases entered into after the date hereof.

16.    Assignment.  Except to with respect to an assignment to an Affiliate of Purchaser, Purchaser shall not assign this Agreement without Trustee's prior written consent which consent may be withheld for any reason or no reason, except that Purchaser may assign its interest under this Agreement to a qualified intermediary in connection with a like-kind exchange as provided in Section 19 below.  Subject to the previous sentence, this Agreement shall apply to, inure to the benefit of and be binding upon and enforceable against the parties hereto and their respective successors and assigns.  Any assignment shall be conditioned upon Trustee's receipt of a duly executed express assumption of all of the duties and obligations of Purchaser by the proposed assignee in a form acceptable to Trustee not less than five (5) business days prior to the Closing Date.  Further, if Purchaser shall assign this Agreement to an Affiliate of Purchaser, Purchaser shall notify Trustee of the same and the identity of the assignee within one (1) business day following the effective date of such assignment.  No assignment of this Agreement shall release the named Purchaser herein.

17.    Remedies.

(a)    (i) IN THE EVENT THAT TRUSTEE SHALL FAIL TO COMPLY WITH HIS EXPRESS OBLIGATIONS UNDER THIS AGREEMENT AFTER WRITTEN NOTICE FROM PURCHASER AND A FIVE (5) BUSINESS DAY PERIOD TO CURE, AND SUCH FAILURE IS NOT A RESULT OF PURCHASER'S DEFAULT OR A TERMINATION OF THIS AGREEMENT BY PURCHASER OR TRUSTEE PURSUANT TO A RIGHT TO DO SO UNDER THE PROVISIONS HEREOF, PURCHASER, IN THE CASE WHERE SUCH FAILURE IS BASED UPON AN INTENTIONAL BREACH BY TRUSTEE ("TRUSTEE'S DEFAULT"), SHALL ONLY BE ENTITLED TO, AT ITS ELECTION, EITHER: (A) THE REMEDY OF SPECIFIC PERFORMANCE, OR (B) TO TERMINATE THIS AGREEMENT BY

WRITTEN NOTICE TO TRUSTEE AND RECEIVE A REFUND OF THE EARNEST MONEY. IN NO EVENT SHALL TRUSTEE BE LIABLE TO PURCHASER FOR ANY PUNITIVE, SPECULATIVE, CONSEQUENTIAL OR OTHER DAMAGES. IN THE CASE WHERE SUCH FAILURE IS BASED UPON AN UNINTENTIONAL BREACH BY TRUSTEE, PURCHASER, AS ITS SOLE AND EXCLUSIVE REMEDY, MAY TERMINATE THIS AGREEMENT AND RECEIVE A REFUND OF THE EARNEST MONEY. EXCEPT IN CONNECTION WITH THE REMEDY OF SPECIFIC PERFORMANCE, PURCHASER SHALL NOT BE ENTITLED TO RECORD A LIS PENDENS OR NOTICE OF PENDENCY OF ACTION AGAINST THE PROPERTY FOR ANY REASON WHATSOEVER.

(ii) PURCHASER SHALL (A) NOTIFY TRUSTEE OF ITS ELECTION TO SEEK THE REMEDY OF SPECIFIC PERFORMANCE ON OR BEFORE THE DATE WHICH IS THIRTY (30) DAYS AFTER THE DATE OF TRUSTEE'S DEFAULT AND (B) INSTITUTE PROCEEDINGS SEEKING SUCH REMEDY ON OR BEFORE THE DATE WHICH IS THIRTY (30) AFTER THE DATE OF PURCHASER'S NOTICE.

(iii) PURCHASER SHALL BE DEEMED TO HAVE WAIVED ITS ELECTION TO SEEK THE REMEDY OF SPECIFIC PERFORMANCE IF PURCHASER DOES NOT (x) NOTIFY TRUSTEE OF SUCH ELECTION AS PROVIDED IN <u>SECTION 17(a)(ii)(A)</u> HEREINABOVE, OR (y) INSTITUTE PROCEEDINGS, SEEKING SUCH REMEDY AS PROVIDED IN <u>SECTION 17(a)(ii)(B)</u> HEREINABOVE.

(iv) NOTWITHSTANDING ANYTHING IN THIS <u>SECTION 17(a)</u> TO THE CONTRARY, FAILURE OF A CONDITION PRECEDENT SHALL NOT BE A DEFAULT HEREUNDER OR ENTITLE PURCHASER TO ANY REMEDY, AND SHALL ONLY ENTITLE PURCHASER TO A REFUND OF THE EARNEST MONEY TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.

(b)    IN THE EVENT THAT PURCHASER SHOULD FAIL TO CONSUMMATE THIS AGREEMENT FOR ANY REASON AFTER WRITTEN NOTICE FROM TRUSTEE AND A FIVE (5) BUSINESS DAY PERIOD TO CURE, EXCEPT TRUSTEE'S DEFAULT OR THE TERMINATION OF THIS AGREEMENT BY PURCHASER OR TRUSTEE PURSUANT TO A RIGHT TO DO SO UNDER THE TERMS AND PROVISIONS HEREOF, THEN THE TRUSTEE, AS HIS SOLE AND EXCLUSIVE REMEDY, MAY ELECT TO EITHER (I) COMPEL PURCHASER TO PERFORM ITS OBLIGATIONS HEREUNDER (INCLUDING TO EFFECT THE CLOSING) PURSUANT TO AN ORDER FOR SPECIFIC PERFORMANCE OBTAINED BY THE TRUSTEE FROM THE COURT AGAINST THE PURCHASER, AND PURCHASER HEREBY IRREVOCABLY AGREES TO NOT CONTEST ANY SUCH ORDER AND ANY PLEADING REQUESTING SUCH ORDER UNLESS PURCHASER SHALL BE ABLE TO PROVE TO THE COURT BY CLEAR AND CONVINCING EVIDENCE THAT IT DOES NOT HAVE THE FINANCIAL WHEREWITHAL OR OTHER ABILITY TO PURCHASE THE PROPERTY AND EFFECT THE CLOSING IN ACCORDANCE WITH THE TERMS HEREOF (THE "<u>TRUSTEE SPECIFIC PERFORMANCE REMEDY</u>"), OR (II) TERMINATE THIS AGREEMENT AND WAIVE SUCH SPECIFIC PERFORMANCE REMEDY BY NOTIFYING PURCHASER THEREOF AND RECEIVE OR RETAIN THE EARNEST MONEY AS LIQUIDATED DAMAGES; PROVIDED HOWEVER, THAT, IN THE EVENT THE COURT DOES NOT ENTER THE ORDER GRANTING THE TRUSTEE SPECIFIC PERFORMANCE REMEDY, TRUSTEE SHALL RETAIN THE EARNEST

MONEY AS LIQUIDATED DAMAGES AND PURCHASER SHALL BE DEEMED TO HAVE IRREVOCABLY FORFEITED ANY AND ALL RIGHTS THERETO. THE PARTIES AGREE THAT, ABSENT THE TRUSTEE SPECIFIC PERFORMANCE REMEDY, TRUSTEE, THE BANKRUPTCY ESTATE AND THE ESTATE ASSETS WILL SUFFER DAMAGES IN THE EVENT OF PURCHASER'S DEFAULT ON ITS OBLIGATIONS. ALTHOUGH THE AMOUNT OF SUCH DAMAGES IS DIFFICULT OR IMPOSSIBLE TO DETERMINE, THE PARTIES AGREE THAT, ABSENT THE TRUSTEE SPECIFIC PERFORMANCE REMEDY, THE AMOUNT OF THE EARNEST MONEY IS A REASONABLE ESTIMATE OF TRUSTEE'S AND THE BANKRUPTCY ESTATE'S LOSS IN THE EVENT OF PURCHASER'S DEFAULT. THUS, IF TRUSTEE WAIVES HIS SPECIFIC PERFORMANCE REMEDY OR THE COURT DOES NOT ENTER AN ORDER GRANTING IT, TRUSTEE SHALL ACCEPT AND RETAIN THE EARNEST MONEY AS LIQUIDATED DAMAGES BUT NOT AS A PENALTY, AND SUCH LIQUIDATED DAMAGES SHALL CONSTITUTE TRUSTEE'S SOLE AND EXCLUSIVE REMEDY AS AN ALTERANTIVE TO THE TRUSTEE SPECIFIC PERFORMANCE REMEDY. IN THE EVENT TRUSTEE WAIVES HIS SPECIFIC PERFORMANCE REMEDY AS SET FORTH HEREINABOVE (OR THE COURT DOES NOT ENTER AN ORDER GRANTING IT) AND IS ENTITLED TO THE EARNEST MONEY AS LIQUIDATED DAMAGES, PURCHASER AGREES TO TAKE ALL SUCH ACTIONS AND EXECUTE AND DELIVER ALL SUCH DOCUMENTS NECESSARY OR APPROPRIATE TO EFFECT SUCH PAYMENT. IN THE EVENT TRUSTEE SUCCESSFULLY BRINGS SUIT OR ACTION TO ENFORCE THE FOREGOING PROVISION, TRUSTEE SHALL BE ENTITLED TO RECOVER FROM PURCHASER HIS ACTUAL ATTORNEYS' FEES, COURT COSTS AND LITIGATION EXPENSES IN CONNECTION THEREWITH.

18.   Miscellaneous.

18.1   Entire Agreement.   This Agreement, together with the exhibits attached hereto, constitute the entire agreement of the parties hereto regarding the purchase and sale of the Property, and all prior agreements, understandings, representations and statements, oral or written, are hereby merged herein. In the event of a conflict between the terms of this Agreement and any prior written agreements, the terms of this Agreement shall prevail. This Agreement may only be amended or modified by an instrument in writing, signed by the party intended to be bound thereby.

18.2   Time.   All parties hereto agree that time is of the essence in this transaction. If the time for performance of any obligation hereunder shall fall on a Saturday, Sunday or holiday (national or in the State of Illinois) such that the obligation hereby cannot be performed, the time for performance shall be extended to the next such succeeding day where performance is possible.

18.3   Counterpart Execution.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original.

18.4   Governing Law.   **THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF INDIANA AND FOR ALL PURPOSES SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF INDIANA.**

18.5   Publicity.   Trustee and Purchaser hereby covenant and agree that, at all times after the date of execution hereof and continuing after the Closing, unless consented to in writing by the

other party, no press release or other public disclosure concerning this transaction shall be made, and each party agrees to use best efforts to prevent disclosure of this transaction. The provisions of this <u>Section 18.5</u> shall survive Closing or any termination of this Agreement.

18.6    <u>Recordation</u>.  Purchaser shall not record this Agreement or a memorandum or other notice thereof in any public office without the express written consent of Trustee.  A breach by Purchaser of this covenant shall constitute a material default by Purchaser under this Agreement.

18.7    <u>Benefit</u>.  This Agreement is for the benefit of Purchaser, Trustee and the Bankruptcy Estate, and except as provided in the indemnities granted by Purchaser in this Agreement and in the Purchase Documents (as defined in <u>Section 18.11</u>) with respect to the Indemnified Parties listed therein, no other person or entity will be entitled to rely on this Agreement, receive any benefit from it or enforce any provisions of it against Purchaser or Trustee or the Bankruptcy  Estate.

18.8    <u>Section Headings</u>.  The Section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several Sections hereof.

18.9    <u>Further Assurances</u>.  Purchaser and Trustee agree to execute all documents and instruments reasonably required in order to consummate the purchase and sale herein contemplated.

18.10    <u>Severability</u>.  If any portion of this Agreement is held to be unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect.

18.11    <u>Forum</u>.  If a controversy arises with respect to the subject matter of this Agreement or any exhibits attached hereto or any documents executed or to be executed in connection herewith (collectively, including this Agreement, said exhibits and all such documents, the "<u>Purchase Documents</u>"), Trustee and Purchaser agree that such controversy shall be adjudicated solely in the United States Bankruptcy Court for the Northern District of Illinois.  In any litigation between the parties hereto, the prevailing party shall be entitled to recover its reasonable fees and costs (including reasonable attorneys' fees), in addition to any other relief to which the party may be entitled.  The provisions of this <u>Section 18.11</u> shall survive Closing or any termination of this Agreement.

18.12    <u>Independent Counsel</u>.  Purchaser and Trustee each acknowledge that: (a) they have been represented by independent counsel in connection with this Agreement; (b) they have executed this Agreement with the advice of such counsel; and (c) this Agreement is the result of negotiations between the parties hereto and the advice and assistance of their respective counsel. The fact that this Agreement was prepared by Trustee's counsel as a matter of convenience shall have no import or significance.  Any uncertainty or ambiguity in this Agreement shall not be construed against Trustee because Trustee's counsel prepared this Agreement in its final form.

18.13    <u>Governmental Approvals</u>.  Nothing contained in this Agreement shall be construed as authorizing Purchaser to apply for a zoning change, variance, subdivision maps, lot line adjustment, or other discretionary governmental act, approval or permit with respect to the Property prior to the Closing, and Purchaser agrees not to do so.  Purchaser agrees not to submit any reports, studies or other documents, including, without limitation, plans and specifications, impact statements for water, sewage, drainage or traffic, environmental review forms, or energy

conservation checklists to any governmental agency, or any amendment or modification to any such instruments or documents prior to the Closing. Purchaser's obligation to purchase the Property shall not be subject to or conditioned upon Purchaser's obtaining any variances, zoning amendments, subdivision maps, lot line adjustment or other discretionary governmental act, approval or permit.

18.14   <u>No Waiver</u>.   No covenant, term or condition of this Agreement other than as expressly set forth herein shall be deemed to have been waived by Trustee or Purchaser unless such waiver is in writing and executed by Trustee or Purchaser, as the case may be.

18.15   <u>Discharge and Survival</u>.   The delivery of the Deed by Trustee, and the acceptance thereof by Purchaser shall be deemed to be the full performance and discharge of every covenant and obligation on the part of Trustee to be performed hereunder except the obligations set forth herein which, by their terms, expressly survive Closing. No action shall be commenced by Purchaser after the Closing on any covenant or obligation except the obligations set forth herein which, by their terms, expressly survive Closing.

18.16   <u>Trustee's Access to Records after Closing.</u>   Purchaser shall reasonably cooperate with Trustee for a period of one (1) year after Closing to make available Purchaser's employees and Property records, as Trustee may reasonably request, in case of Trustee's need in response to any order of the Court, legal requirement, tax audit, tax return preparation, securities law filing, or litigation threatened or brought against Trustee, by allowing Trustee and its agents or representatives access, upon reasonable advance notice (which notice shall identify the nature of the information sought by Trustee), at all reasonable times to examine and make copies of any and all instruments, files and records which predate the Closing and which pertain to the Property; provided, however, that nothing contained in this <u>Section 18.16</u> shall require Purchaser to retain any files or records for any particular period of time. This <u>Section 18.16</u> shall survive Closing.

19.   <u>Like-Kind Exchange</u>.   Purchaser hereby reserves the right to make the transaction a part of a tax-deferred exchange under Section 1031 of the Internal Revenue Code. In such event, Trustee shall cooperate with Purchaser to effectuate the tax-deferred exchange, including without limitation, acknowledging the assignment by Purchaser of its interest in this Agreement to the qualified intermediary. Purchaser acknowledges that Trustee shall have no responsibility for the tax treatment given to Purchaser for this transaction and that Trustee shall have no obligation to incur any expense, liability or cost in connection with such exchange transaction by Purchaser.

20.   <u>Exculpation of Trustee</u>.   Notwithstanding anything to the contrary contained in this Agreement or in any of the other Purchase Documents, from and after Closing it is expressly understood and agreed by and between the parties hereto that:   (i) the recourse of Purchaser or its successors or assigns against Trustee with respect to the alleged breach by or on the part of Trustee of any representation, warranty, covenant, undertaking, indemnity or agreement contained in any of the Purchase Documents (collectively, " <u>Trustee's Undertakings</u>") shall (x) be deemed waived unless Purchaser has delivered to Trustee written notice that Purchaser is seeking recourse under Trustee's Undertakings (the "<u>Recourse Notice</u>") after the Closing Date but prior to the date that is six (6) months after the Closing Date and Purchaser has filed suit with respect to the same within one (1) month after the date of Purchaser's delivery to Trustee of the Recourse Notice, (y) only be payable by or recoverable against the Bankruptcy Estate and the Estate Assets and never against the Trustee personally, and shall nevertheless be limited to an amount not to exceed one percent

(1%) of the Purchase Price in the aggregate of all recourse of Purchaser under the Purchase Documents, and (z) shall exclude any claim for any punitive, speculative or consequential damages; and (ii) without limiting the generality of the foregoing, no personal liability or personal responsibility of any sort with respect to any of Trustee's Undertakings or any alleged breach thereof is assumed by, or shall at any time be asserted or enforceable against, Trustee or any of his employees, agents, attorneys, partners, or other Representatives or affiliates at any time.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused these presents to be made as of the day and year first above stated.

TRUSTEE:

N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430

PURCHASER:

Peerless Development, LLC,

a Limited Liability Company

By:_____

Name: Michael Cordaro

Its: Manager

IN WITNESS WHEREOF, the parties hereto have caused these presents to be made as of the day and year first above stated.

TRUSTEE:

_____

N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430

PURCHASER:

Peerless Development, LLC,

a Limited Liability Company

By: _____

Name: Michael Cordaro

Its: Manager

## <u>LIST OF EXHIBITS AND SCHEDULES</u>

Exhibit A     -     Legal Description

Exhibit B     -     Form of Earnest Money Escrow Agreement

Exhibit C     -     Form of Quitclaim Deed

Exhibit D     -     Form of Bill of Sale

Exhibit E     -     Form of Assignment and Assumption of Designated Contracts

Exhibit F     -     Form of Assignment and Assumption of Licenses and Permits and Intangible Property

Exhibit G     -     Form of Non-Foreign Affidavit

Exhibit H     -     Form of Tenant Notification Letter

Exhibit I     -     Form of Vendor Notification Letter

Exhibit J     -     Form of Final Order

Schedule 3.1     Trustee Delivery Items

Schedule 6.2     -     List of Tenants

Schedule 6.3     -     List of Service Contracts

Schedule 6.4     -     List of Violations

**EXHIBIT A**

**LEGAL DESCRIPTION**


Parcel 1:

A parcel of land in the Northwest Quarter of the Northwest quarter of Section 13, Township 36 North, Range 7 West and in the Southwest quarter of the Southwest Quarter of Section 12, Township 36 North, Range 7 West of the Second Principal Meridian, in Porter County, Indiana, bounded and described as follows:

Commencing at a point on the West line of said Northwest Quarter which is 1,144.40 feet North of the Southwest corner of said Northwest Quarter of the Northwest Quarter and running North 00 degrees 00 minutes 00 seconds East along said West line 172.15 feet to the Southwest corner of said Southwest Quarter of Southwest Quarter ; thence North 00 degrees 19 minutes 30 seconds West along the West line of said Section 12, 164.96 feet to the southerly right of way of Indiana East- West Toll Road; thence along said southerly right of way of the 7 following courses and distances; South 86 degrees 28 minutes 48 seconds East a chord bearing and distance of 81.28 feet, South 03 degrees 25 minutes08 seconds West 30 feet; South 87 degrees 20 minutes 26 seconds East a chord bearing and distance of 612.34 feet; South 88 degrees 6 minutes East 17.30 feet; South 45 degrees 28 minutes 41 seconds East 71.14 feet; South 09 degrees 40 minutes 42 seconds East 54.20 feet; South 05 degrees 22 minutes 11 seconds East 74.11 feet; thence South 00 degrees 00 minutes 00 seconds East 94.43 feet; thence South 89 degrees 53 minutes 00 seconds West 744.15 feet to the point of beginning.

Parcel 2:

An Easement for ingress and egress for the benefit of Parcel 1 as set forth in Deed Record 346 page 473, as follows:

A part of the Northwest Quarter of the Northwest Quarter of Section 13, Township 36 North, Range 7 West of the Second Principal Meridian, in Portage Township, Porter County, State of Indiana, more particularly described as follows:

From the Northwest corner of said Section 13, thence on an assumed bearing of South 00 degrees 00 minutes 00 seconds East, on and along the West line of said Northwest Quarter, a distance of 172.15 feet to a point; thence continue on an assumed bearing of South 00 degrees 00 minutes 00 seconds East, on and along the West line of said Northwest Quarter, a distance of 236.45 feet to a point; thence continue on an assumed bearing of South 00 degrees 00 minutes 00 seconds East, on and along the West line of said Northwest quarter a distance of 101.03 feet to a point; thence North 89 degrees 53 minutes 00 seconds East a distance of 50.00 feet, more or less to a point on the East right of way line of Willowcreek Road, which right of way line is parallel to the West line of said Northwest Quarter and 50.00 feet East thereof, as measured perpendicularly thereto, said point on the East right of way line being the point of beginning; from the aforesaid point of beginning thence North 89 degrees 53 minutes 00 seconds East a distance of 35.82 feet to a point; thence North 08 degrees 55 minutes 00 seconds East a distance of 341.72 feet to a point on the South boundary of the above described parcel; thence South 89 degrees 53 minutes 00 seconds West on and along the South boundary of the above described parcel a distance of 50.13 feet; thence South 08 degrees55 minutes 00 seconds West a distance of 239.42 feet; thence south 89 degrees 53 minutes 00 seconds West a distance of 1.55 feet to a point on the easterly right of way line of Willowcreek Road; thence South 00 degrees 00 minutes 00 seconds East along the East right of way line of Willowcreek Road a distance of 101.03 feet to the point of beginning.

Parcel 3:

A part of the North 30 rods of the Southwest Quarter of the Southwest Quarter of Section 12, Township 36 North, Range 7 West of the Second Principal Meridian in Porter County, Indiana, referenced to the Northwest corner thereof; thence at a bearing of South 01 degrees 00 minutes 26 seconds East for a distance of 363.00 feet along the West line of said Southwest Quarter, Southwest Quarter which bearing and subsequent bearings are consistent with bearings used in connection with the taking of the land of Daniel J. Roszkowski by Indiana East- West Toll Road Project ITR-23-80(01) as shown in Deed Record 352 page 241 in the Office of the Recorder of Porter County; thence North 89 degrees 04 minutes 01 seconds East 56.87 feet along a line parallel to the North line of said Southwest Quarter, Southwest Quarter to the point of intersection of the East right of way line of Willowcreek Road and the South right of way line of McCasland Avenue, which point is the point of beginning; thence continuing North 89 degrees 04 minutes 01 seconds East 331.68 feet along said South right of way line; thence North 79 degrees 25 minutes 38 seconds East 209.01 feet along said South right of way line; thence North 89 degrees 04 minutes 01 seconds East 30.35 feet along said South right of way line; thence South 01 degrees 00 minutes 26 seconds East 167.00 feet to the South line of said North 30 rods; thence South 89 degrees 04 minutes 01 seconds West 550.00 feet along said South line of the North 30 rods to said East right of way line of Willowcreek Road; thence North 08 degrees 49 minutes 38 seconds West 133.26 feet to the point of beginning.

Together with another part of said North 30 rods of said Southwest Quarter Southwest Quarter referenced to a point on the West line thereof and 313.00 feet South of the Northwest corner thereof, which point is the intersection of the centerline of Willowcreek Road and the North right of way of McCasland Avenue; thence North 89 degrees 04 minutes 01 seconds East 330.00 feet along said North right of way line to the point of beginning; thence continuing North 89 degrees 04 minutes 01 seconds East 54.33 feet along said North right of way line; thence North 79 degrees 25 minutes 38 seconds East 91.95 feet along said North right of way line to the West right of way line of Dixie Drive; thence North 01 degrees 00 minutes 25 seconds West 290.10 feet along said West right of way line to a point 7.50 feet South of the North line of said Southwest Quarter Southwest Quarter; thence South 89 degrees 04 minutes 01 seconds West 145.00 feet; thence South 01 degrees 00 minutes 26 seconds East, 305.50 feet to the point of beginning.

Together with another part of said North 30 rods of said Southwest Quarter Southwest Quarter referenced to the aforesaid intersection of the centerline of Willowcreek Road and the North right of way line of McCasland Avenue; thence North 89 degrees 04 minutes 01 seconds East 384.33 feet along said North right of way line; thence North 79 degrees 25 minutes 38 seconds East 142.65 feet along said North right of way line to its intersection with the East right of way line of Dixie Drive, which intersection is the point of beginning; thence continuing North 79 degrees 25 minutes 38 seconds East 66.36 feet along said North right of way line; thence North 89 degrees 04 minutes 01 seconds East 92.89 feet along said North right of way line; thence North 01 degrees 00 minutes 26 seconds West 245.34 feet to a point 32.66 feet South of the North line of said Southwest Quarter, Southwest Quarter; thence South 89 degrees 04 minutes 01 seconds West 158.33 feet to the East right of way line of Dixie Drive; thence South 01 degrees 00 minutes 26 seconds East 256.45 feet to the point of beginning.

Address of Property:   2400 Dixie Drive, Portage, Indiana 46368

Key Nos.:  64-05-12-351-008.000-016,  64-05-12-351-009.000-016,  64-05-12-351-010.000-016,
64-05-12-351-011.000-016 and 64-05-12-352-002.000-016


Address of Property:   6021 Canden Avenue, Portage, Indiana 46368

Key Nos.: 64-05-13-101.001.000-016 and 64-05-12-353-001-000-016

## EXHIBIT B

Form of Earnest Money Escrow Agreement

## CHICAGO TITLE AND TRUST INSURANCE COMPANY

10 S. LaSalle St., St. 3100                      Phone: (312) 223-2125

Chicago, IL 60603                                Fax:   (312) 223-4951

Attn: Krystina Cozzie

Escrow No.: CCHI2200740NJ                        Re:    Town & Country Apartments

Date:_____2022                               2400 Dixie Drive

                                                        6021 Canden Avenue

                                                        Portage, Indiana 46368

### STRICT JOINT ORDER ESCROW

The accompanying _____ and 00/100 Dollars ($_____.00) is deposited with Chicago Title and Trust Company as Escrowee to be delivered by it only upon the joint order of the undersigned or their respective legal representatives or assigns.

Escrowee is hereby expressly authorized to disregard, in its sole discretion, any and all notices or warnings given by any of the parties hereto, or by any other person or corporation, but the said Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the said Escrowee obeys or complies with any such order, judgment or decrees of any court it shall not be liable to any of the parties hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated. In case of any suit or proceeding regarding this escrow, to which said Escrowee is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, attorneys' and solicitors' fees, whether such attorneys or solicitors shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned jointly and severally agree to pay said Escrowee upon demand all such costs, fees and expenses so incurred.

In no case shall the above mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience of the process or order of court as aforesaid.

Deposits made pursuant to these instructions shall be invested in federally issued or insured interest bearing instrument(s) on behalf of any party or parties thereto; provided, that any direction to Escrowee for such investment shall be expressed in writing and contain the consent of all the parties to this escrow, and also provided that Escrowee is in receipt of the tax payer's identification

number and investment forms as required.  Escrowee will, upon request, furnish information concerning its procedures and fee schedules for investment.

Except as to deposits of funds for which Escrowee has received express written direction concerning investment or other handling, the parties hereto agree that the Escrowee shall be under no duty to invest or reinvest any deposits at any time held by it hereunder; and further, that Escrowee may commingle such deposits with other deposits or with its own funds in the manner provided for the administration of funds under the applicable laws of the State in which the funds are held and may use any part or all such funds for its own benefit without obligation to any party for interest derived thereby, if any; provided, however, nothing herein shall diminish Escrowee's obligation to apply the full amount of the deposits in accordance with the terms of this Agreement. In the event the Escrowee is requested to invest deposits hereunder, Escrowee is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investment for the purposes of these escrow instructions.


PURCHASER:


_____,

a _____


Signed By:_____

Name:_____

Its:_____

Address: _____

Purchaser's Federal Tax Identification Number: _____

   TRUSTEE:


   _____

   N. Neville Reid, not individually, but
   solely as Trustee appointed on October 26,
   2021 by the United States Bankruptcy
   Court for the Northern District of Illinois in
   Case No. 21-08430


Address - c/o Fox Swibel Levin & Carroll LLP, 200 W. Madison Street, Suite 3000, Chicago, Illinois  60606.

ACCEPTED:

Chicago Title and Trust Company


By: _____

Name:_____

Its:_____

## EXHIBIT C

## QUITCLAIM DEED

[Form of Deed subject to modification upon consultation with Title Company]

THE GRANTOR, N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430, pursuant to the authority conferred by said Court in the referenced proceeding, for and in consideration of Ten and No/100 DOLLARS ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby CONVEY and QUIT CLAIM to _____, on a strictly "as is, where is" basis without any representation or warranty by said Trustee or any of his representatives, the following described real estate, situated in the County of Porter and State of Indiana known and described as follows, to wit:

See Exhibit "A" attached hereto and made a part hereof.

Subject to:  The matters disclosed on Exhibit "B" attached hereto and made a part hereof.

Key Nos.:                          _____

Address(es) of real estate: 2400 Dixie Drive and 6021 Canden Avenue, Portage, Indiana  46368

This instrument was prepared by:          Stephanie B. Shellenback, Esq.
                                          Fox Swibel Levin & Carroll LLP
                                          200 West Madison Street
                                          Suite 3000
                                          Chicago, Illinois 60606

Mail to:                                  Send Subsequent tax bills to:

_____          _____
_____          _____
_____          _____
_____          _____

**IN WITNESS WHEREOF,** the Grantor has executed this Quitclaim Deed as of the _____ day of _____, 2022.

GRANTOR:

_____

N. Neville Reid, not individually, but
solely as Trustee appointed on October
26, 2021 by the United States
Bankruptcy Court for the Northern
District of Illinois in Case No. 21-08430

STATE OF _____      )

                                 ) SS.

COUNTY OF _____      )


          I, the undersigned, a Notary Public in and for the County and State aforesaid, DO HEREBY
CERTIFY, that the above named N. Neville Reid, not individually, but solely as Trustee appointed
on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in
Case No. 21-08430, personally known to me to be the same person whose name is subscribed to
the foregoing instrument as such Trustee, appeared before me this day in person and acknowledged
that he signed and delivered the said instrument as his own free and voluntary act and as the free
and voluntary act,  in his capacity as Trustee as foresaid, for the uses and purposes therein set forth.


          Given under my hand and Notary Seal, this ___ day of _____, 2022.



_____

                                    Notary Public

<u>EXHIBIT A</u>

(TO DEED)

LEGAL DESCRIPTION

Address of Property:   2400 Dixie Drive and 6021 Canden Avenue, Portage, Indiana  46368

Key Nos.:  _____

## EXHIBIT B

(TO DEED)

PERMITTED EXCEPTIONS

**EXHIBIT D**

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS, that N. Neville Reid, not individually but solely as Trustee ("Trustee") appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430, in consideration of Ten and 00/00 Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby cause to be sold, assigned, transferred, quit claimed and set over unto _____, a _____ ("Purchaser"), free and clear of all liens claims and encumbrances, all furniture, furnishings, fixtures, equipment and other personal property located at the Property including such property set forth on Exhibit A attached hereto and made a part hereof (the "Personal Property") located at, on and about the real estate commonly known as Town & Country Apartments and legally described in the Agreement, as hereinafter defined (the "Premises").

TO HAVE AND TO HOLD the Personal Property unto Purchaser and Purchaser's heirs, legal representatives, successors and assigns forever.

ALL WARRANTIES OF QUALITY OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY ARE EXPRESSLY EXCLUDED. THE PERSONAL PROPERTY SOLD HEREUNDER IS SOLD IN "AS IS" CONDITION WITHOUT ANY REPRESENTATION OR WARRANTY BY TRUSTEE.

Any liability of Trustee hereunder shall be limited (i) as set forth in Section 20 of that certain Agreement of Purchase and Sale between Trustee and Purchaser dated _____ ___, 20__ (the "Agreement") and (ii) as otherwise expressly set forth in any other provisions of the Agreement.

IN WITNESS WHEREOF, Trustee has signed this Bill of Sale at Chicago, Illinois this _____ day of _____, 2022.

TRUSTEE:

_____

N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430

EXHIBIT A

(BILL OF SALE)

LIST OF PERSONAL PROPERTY

## EXHIBIT E

## ASSIGNMENT AND ASSUMPTION OF DESIGNATED CONTRACTS

FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, N. Neville Reid, not individually but solely as Trustee ("Trustee") appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430 (the Bankruptcy Estate created by such case and the orders entered therein, the "Bankruptcy Estate"), hereby causes to be sold, transferred, assigned and set over unto _____, a _____ ("Assignee"), its legal representatives, successors and assigns all of the right, title and interest of the Bankruptcy Estate, as landlord or lessor in, to and under (a) the leases with the tenants referred to on Part I of Exhibit A attached hereto and made a part hereof (the "Leases") affecting the real estate legally described in the Agreement (as hereinafter defined) and commonly known as Town & Country Apartments, 2400 Dixie Drive and 6021 Canden Avenue, Portage, Indiana (the "Property"), (b) the rent therein referred except for Seller's Rentals (as defined in that certain Agreement of Purchase and Sale by and between Trustee and Assignee dated as of _____, 20__, and hereinafter referred to as the "Agreement") and (c) those agreements referred to on Part II of Exhibit A attached hereto and made a part hereof (the "Contracts") affecting the Property. The Leases and the Contracts are hereinafter together referred to as the "Designated Contracts".

Assignee does hereby accept the foregoing Assignment and Assumption of Designated Contracts subject to the terms and conditions herein and in the Leases or the Contracts, as the case may be, and does hereby assume, without exculpation, as of the Closing Date, and become responsible for and agree to perform, discharge, fulfill and observe all of the obligations, terms, covenants, provisions and conditions under the Designated Contracts arising from and after the Closing Date, and Assignee agrees to be liable for the observance and performance thereof as fully as though Assignee was the original landlord or lessor thereunder (in the case of the Leases) or the original party thereunder (in the case of the Contracts).  Assignee agrees to protect, defend, indemnify and hold harmless Trustee, the Bankruptcy Estate, and the Trustee's  legal representatives, successors and assigns from any and all losses, damages, expenses, fees (including without limitation reasonable attorneys' fees), court costs, suits, judgments, liability, claims and demands whatsoever in law or in equity, incurred or suffered by Trustee, his legal representatives, successors and assigns or any of them or the Bankruptcy Estate arising out of or in connection with the Designated Contracts as to events occurring from and after the Closing Date. .   Pursuant to the Agreement including Section 3.2(c) thereof, Assignee shall be solely responsible for any costs of curing any defaults that arose under any Designated Contract prior to the Closing.

This Assignment and Assumption of Designated Contracts shall be binding upon and shall inure to the benefit of Trustee and Assignee and their respective beneficiaries, legal representatives, heirs, successors and assigns.

This Assignment and Assumption of Designated Contracts may be executed in counterparts, and as so executed shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Designated Contracts this _____ day of _____, 2022.

TRUSTEE:

_____

N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430

ASSIGNEE:

_____,
a _____

By:_____

Name:_____

Its: _____

# EXHIBIT A

## (TO ASSIGNMENT AND ASSUMPTION OF DESIGNATED CONTRACTS)

**PART I - LIST OF LEASES**

**PART II - LIST OF CONTRACTS**

**EXHIBIT F**

**ASSIGNMENT AND ASSUMPTION OF**

**LICENSES AND PERMITS AND INTANGIBLE PROPERTY**

FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, N. Neville Reid, not individually but solely as Trustee ("Trustee") appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430 (the bankruptcy estate created by such case , the "Bankruptcy Estate"), hereby causes to be sold, transferred, assigned, quit claimed and sets over unto _____, a _____ ("Assignee"), its legal representatives, successors and assigns effective as of the Closing Date (as defined in that certain Agreement of Purchase and Sale by and between Trustee and Assignee dated as of _____, 20__, and hereinafter referred to as the "Agreement") all of the  right, title and interest of the Bankruptcy Estate in, to and under all licenses, warranties and permits relating to the construction, use and operation of the Property and the Intangible Property (as defined in the Agreement).

Assignee does hereby accept the foregoing Assignment and Assumption of Licenses and Permits and Intangible Property and does hereby assume, without exculpation, as of the Closing Date, and become responsible for and agree to perform, discharge, fulfill and observe all of the obligations, terms, covenants, provisions and conditions thereunder arising from and after the date hereof, and Assignee agrees to be liable for the observance and performance thereof as fully as though Assignee was the original party thereunder.  Assignee agrees to protect, defend, indemnify and hold harmless Trustee, his legal representatives, successors and assigns and the Bankruptcy Estate from any and all losses, damages, expenses, fees (including without limitation reasonable attorneys' fees), court costs, suits, judgments, liability, claims and demands whatsoever in law or in equity, incurred or suffered by Trustee, his legal representatives, successors and assigns or any of them or the Bankruptcy Estate arising out of or in connection with the Licenses and Permits and Intangible Property, as to events occurring from and after the Closing Date.

This Assignment and Assumption of Licenses and Permits and Intangible Property shall be binding upon and shall inure to the benefit of Trustee and Assignee and their respective beneficiaries, legal representatives, heirs, successors and assigns.

This Assignment and Assumption of Licenses and Permits and Intangible Property may be executed in counterparts, and as so executed shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Licenses and Permits and Intangible Property this _____ day of _____, 2022.

TRUSTEE:

_____

N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430

ASSIGNEE:

_____,

a _____

By:_____

Name:_____

Its: _____

## EXHIBIT G

## <u>NON-FOREIGN AFFIDAVIT</u>

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest, the undersigned hereby certifies the following on behalf of Town and Country Partners LLC, an Illinois limited liability company ("Transferor") in connection with the disposition of certain property known as Town & Country Apartments located at 2400 Dixie Drive and 6021 Canden Avenue, Portage, Indiana:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign estate, or foreign person (as those terms are defined in the Internal Revenue Code and the Income Tax Regulations promulgated thereunder);

2. Transferor is not a disregarded entity for federal income tax purposes.  The proper name and FEIN for reporting this sale is Town and Country Partners LLC, an Illinois limited liability company, FEIN number _____; and

3. Transferor's address is c/o N. Neville Reid, Fox Swibel Levin & Carroll LLP, Suite 3000, Chicago, Illinois 60606.

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that he has examined this certification and to the best of his actual knowledge and belief it is true, correct and complete, and he further declares that it has authority to sign this document on behalf of Transferor as the court-appointed bankruptcy trustee thereof.

Dated:  _____, 2022.

TRUSTEE:

_____

N. Neville Reid, not individually, but solely as Trustee appointed on October 26, 2021 by the United States Bankruptcy Court for the Northern District of Illinois in Case No. 21-08430

## EXHIBIT H

Tenant Notification Letter

_____, 2022

**Re:**        **Town & Country Apartments, Portage, Indiana**

Dear Tenant:

You are hereby advised that the above referenced property in which you are a tenant was sold and your lease was assigned and transferred effective as of the date of this letter to _____, a _____ (the "Purchaser"). [[Your security deposit and advance rental, if any, has been transferred to the Purchaser]][1], whose address is set forth below.  The above referenced property will be managed by [[MANAGEMENT COMPANY]] and all checks for rent and other charges should be made payable to [[_____]] and forwarded to:

[[MANAGEMENT COMPANY]]

[[Property Address]]

In accordance with the terms of your lease, copies of all future notices to landlord should be sent to:

_____

_____

_____

If you have any questions or need any additional information, please feel free to contact the management office at [[Telephone Number]].

---

[1] Subject to revision if no security deposits or advance payments

Sincerely,

TRUSTEE:                                      PURCHASER:

                                             _____,
                                             a _____
_____
N. Neville Reid, not individually, but solely as    By:_____
Trustee appointed on October 26, 2021 by the
United States Bankruptcy Court for the       Name:_____
Northern District of Illinois in Case No. 21-
08430                                        Its: _____

# EXHIBIT I

Vendor Notification Letter

_____, 2022

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

[[Vendor]]

**RE:    Town & Country Apartments, Portage, Indiana**

Gentlemen:

This is to advise you that the above referenced property was sold to _____, a _____ (the "Purchaser").  As part of the sale, your contract has been assigned to Purchaser, and any goods, services or utilities supplied to the property subsequent to the date of this letter shall be for its account.  The above referenced property will be managed by [[Management Company]] and all future invoices and correspondence and any and all Notices to Purchaser should be sent to:

[[ADDRESS]]

TRUSTEE:                                              PURCHASER:

_____,

_____          a _____

N. Neville Reid, not individually, but solely as          By:_____
Trustee appointed on October 26, 2021 by the
United States Bankruptcy Court for the          Name:_____
Northern District of Illinois in Case No. 21-
08430          Its: _____

## EXHIBIT J

Form of Final Order

[to be agreed between the parties]

## SCHEDULE 3.1

### TRUSTEE DELIVERY ITEMS

1. Commitment for Title Insurance issued by Chicago Title Insurance Company dated January 21, 2022 and last revised on March 4, 2022, Commitment Number CCHI2200709NT (the "Title Commitment").

2. ALTA/ACSM Land Survey prepared by Titan USA Commercial Real Estate Services, LLC dated February 14, 2022 (the "Survey").

3. Appraisal of Real Property prepared by Cushman & Wakefield of Illinois, Inc. dated January 8, 2021.

4. Alarm System Inspection Report dated March 7, 2022 issued by Koorsen Fire & Security.

5. Balcony Review Investigation Invoice dated November 29, 2021 issued by ThorntonTomasetti.

6. Current Tax Bills.

7. Current Detailed Rent Roll

8. Bill Detail for Indiana American Water.

9. Bill Detail for City of Portage Building Department.

10. Bill Detail for Homewood Disposal Service Inc.

11. Bill Detail for Nipsco.

12. Bill Detail for State Farm Fire and Casualty Company.

13. History Printouts for Portage Utility dated January 19, 2022.

14. Agreement of Lease dated January 4, 2021 with Jasmine Thomas.

15. Agreement of Lease dated January 4, 2021 with Monicko P. Hill.

16. Agreement of Lease dated January 4, 2021 with Natasha N. Morris.

17. Agreement of Lease dated May 18, 2021 with Shanique Battle.

18. Agreement of Lease dated January 4, 2021 with Stacy Camacho.

19. Agreement of Lease dated July 20, 2021 with Tanesha Johnson.

20. Agreement of Lease dated March 25, 2021 with Taura Turner.

21. Agreement of Lease dated October 1, 2021 with Samia Ward.

22. Contract dated January 25, 2022 with Bushwackers Lawn Care and Snow Removal.

23. Property Management Agreement dated October 26, 2021 with 33 Management, L.L.C.

24. Standard Laundry Room Lease dated June 1, 2008 with Clark/School LLC.

25. Service Agreement for 2391 Dixie Dr., Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

26. Service Agreement for 2400 Dixie Dr., Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

27. Service Agreement for 6031 Canden, Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

28. Service Agreement for 6086 McCasland, Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

## SCHEDULE 6.2

<u>LIST OF TENANTS</u>

RENT ROLL

**Rent Roll**

**Properties:** Town and Country - 6021-6055 Canden Ave, Dixie Dr, McCasland ave Portage, IN 46368
**Units:** Active
**As of:** 03/23/2022
**Include Non-Revenue Units:** No

| Unit | BD/BA | Tenant | Status | Rent | Recurring Charges | Deposit | Lease From | Lease To |
|------|-------|--------|--------|------|-------------------|---------|------------|----------|
| Town and Country - 6021-6055 Canden Ave, Dixie Dr, McCasland ave Portage, IN 46368 | | | | | | | | |
| 2394-A | 2/1.00 | | | | | | 02/01/2020 | 06/30/2023 |
| 6051-3 | 2/1.00 | | | | | | 07/01/2020 | 05/31/2023 |
| 6061-D | 2/1.00 | | | | | | 05/07/2021 | 04/30/2023 |
| 6031-2 | 2/1.00 | | | | | | 04/01/2020 | 04/30/2023 |
| 6035-3 | 2/1.00 | | | | | | 07/01/2020 | 04/30/2023 |
| 6035-1 | 2/1.00 | | | | | | 02/01/2021 | 04/30/2023 |
| 2386-B | 1/1.00 | | | | | | 02/01/2020 | 03/31/2023 |
| 6051-1 | 2/1.00 | | | | | | 01/01/2021 | 03/31/2023 |
| 2394-D | 2/1.00 | | | | | | 03/04/2022 | 03/03/2023 |
| 6021-3 | 2/1.00 | | | | | | 02/26/2022 | 02/25/2023 |
| 2394-B | 2/1.00 | | | | | | 02/25/2022 | 02/24/2023 |
| 6045-6 | 2/1.00 | | | | | | 10/01/2020 | 10/31/2022 |
| 6121-A | 2/1.00 | | | | | | 10/01/2021 | 09/30/2022 |
| 6035-6 | 2/1.00 | | | | | | 10/01/2021 | 09/30/2022 |
| 6055-6 | 2/1.00 | | | | | | 10/01/2021 | 09/30/2022 |
| 6045-4 | 2/1.00 | | | | | | 08/01/2021 | 07/31/2022 |
| 6081-D | 1/1.00 | | | | | | 07/08/2020 | 06/30/2022 |
| 6031-3 | 2/1.00 | | | | | | 06/03/2021 | 05/31/2022 |
| 6055-3 | 2/1.00 | | | | | | 06/01/2021 | 05/31/2022 |
| 6035-5 | 2/1.00 | | | | | | 05/01/2021 | 04/30/2022 |
| 2378-C | 2/1.00 | | | | | | 05/01/2021 | 04/30/2022 |
| 6045-1 | 2/1.00 | | | | | | 04/01/2021 | 03/31/2022 |
| 6041-1 | 2/1.00 | | | | | | 04/01/2021 | 03/31/2022 |
| 6081-A | 1/1.00 | | | | | | 02/01/2021 | 01/31/2022 |
| 2385-C | 2/1.00 | | | | | | 02/01/2021 | 01/31/2022 |
| 2397-A | 2/1.00 | | | | | | 01/01/2020 | 12/31/2021 |
| 6041-3 | 2/1.00 | | | | | | 01/01/2021 | 12/31/2021 |
| 6041-B | 1/1.00 | | | | | | 01/01/2021 | 12/31/2021 |
| 6041-5 | 2/1.00 | | | | | | 02/01/2021 | 12/31/2021 |

**Rent Roll**

| Unit | BD/BA | Tenant | Status | Rent | Recurring Charges | Deposit | Lease From | Lease To |
|------|-------|--------|--------|------|-------------------|---------|-----------|----------|
| 2385-B | 1/1.00 | | | | | | 01/01/2021 | 12/31/2021 |
| 6031-5 | 2/1.00 | | | | | | 01/01/2021 | 12/31/2021 |
| 6035-4 | 2/1.00 | | | | | | 12/15/2020 | 11/30/2021 |
| 6025-1 | 2/1.00 | | | | | | 12/15/2020 | 11/30/2021 |
| 2386-A | 2/1.00 | | | | | | 12/01/2020 | 11/30/2021 |
| 6101-D | 2/1.00 | | | | | | 11/01/2020 | 10/31/2021 |
| 2391-A | 2/1.00 | | | | | | 11/01/2020 | 10/31/2021 |
| 2400-A | 2/1.00 | | | | | | 10/15/2020 | 09/30/2021 |
| 2400-C | 2/1.00 | | | | | | 10/01/2020 | 09/30/2021 |
| 6045-5 | 2/1.00 | | | | | | 10/01/2020 | 09/30/2021 |
| 6025-3 | 2/1.00 | | | | | | 09/01/2020 | 08/31/2021 |
| 2394-C | 2/1.00 | | | | | | 07/01/2020 | 06/30/2021 |
| 6021-4 | 2/1.00 | | | | | | 07/01/2020 | 06/30/2021 |
| 6025-5 | 2/1.00 | | | | | | 07/22/2020 | 06/30/2021 |
| 6055-5 | 2/1.00 | | | | | | 07/01/2020 | 06/30/2021 |
| 6031-4 | 2/1.00 | | | | | | 06/01/2020 | 05/31/2021 |
| 2397-D | 2/1.00 | | | | | | 02/01/2020 | 01/31/2021 |
| 6021-6 | 2/1.00 | | | | | | 02/01/2020 | 01/31/2021 |
| 6031-6 | 2/1.00 | | | | | | 02/01/2020 | 01/31/2021 |
| 2378-A | 2/1.00 | | | | | | | |
| 2378-B | 1/1.00 | | | | | | | |
| 2378-D | 2/1.00 | | | | | | | |
| 2385-A | 2/1.00 | | | | | | | |
| 2385-D-Model Unit | 2/1.00 | | | | | | | |
| 2386-C | 2/1.00 | | | | | | | |
| 2386-D | 2/1.00 | | | | | | | |
| 2391-B | 1/1.00 | | | | | | | |
| 2391-C | 2/1.00 | | | | | | | |
| 2391-D | 2/1.00 | | | | | | | |
| 2397-B | 1/1.00 | | | | | | | |
| 2397-C | 2/1.00 | | | | | | | |
| 2400-D | 2/1.00 | | | | | | | |
| 6021-A | 1/1.00 | | | | | | | |



Created on 03/23/2022

Page 2

53

**Rent Roll**

| Unit | BD/BA | Tenant | Status | Rent | Recurring Charges | Deposit | Lease From | Lease To |
|------|-------|--------|--------|------|-------------------|---------|------------|----------|
| 6021-B | 1/1.00 | | | | | | | |
| 6021-C | 1/1.00 | | | | | | | |
| 6021-D | 1/1.00 | | | | | | | |
| 6021-1 | 2/1.00 | | | | | | | |
| 6021-2 | 2/1.00 | | | | | | | |
| 6021-5 | 2/1.00 | | | | | | | |
| 6025-2 | 2/1.00 | | | | | | | |
| 6025-4 | 2/1.00 | | | | | | | |
| 6025-6 | 2/1.00 | | | | | | | |
| 6031-1 | 2/1.00 | | | | | | | |
| 6035-2 | 2/1.00 | | | | | | | |
| 6041-A | 2/1.00 | | | | | | | |
| 6041-C | 2/1.00 | | | | | | | |
| 6041-D | 2/1.00 | | | | | | | |
| 6041-2 | 2/1.00 | | | | | | | |
| 6041-4 | 2/1.00 | | | | | | | |
| 6041-6 | 2/1.00 | | | | | | | |
| 6045-2 | 2/1.00 | | | | | | | |
| 6045-3 | 2/1.00 | | | | | | | |
| 6051-2 | 2/1.00 | | | | | | | |
| 6051-4 | 2/1.00 | | | | | | | |
| 6051-5 | 2/1.00 | | | | | | | |
| 6051-6 | 2/1.00 | | | | | | | |
| 6055-1 | 2/1.00 | | | | | | | |
| 6055-2 | 2/1.00 | | | | | | | |
| 6055-4 | 2/1.00 | | | | | | | |
| 6061-A | 2/1.00 | | | | | | | |
| 6061-B | 1/1.00 | | | | | | | |
| 6061-C | 2/1.00 | | | | | | | |
| 6081-B | 1/1.00 | | | | | | | |
| 6081-C | 1/1.00 | | | | | | | |
| 6101-A | 2/1.00 | | | | | | | |
| 6101-B | 1/1.00 | | | | | | | |
| 6101-C | 2/1.00 | | | | | | | |



Created on 03/23/2022

**Rent Roll**



| Unit | BD/BA | Tenant | Status | Rent | Recurring Charges | Deposit | Lease From | Lease To |
|------|-------|--------|--------|------|-------------------|---------|------------|----------|
| 6121-B | 1/1.00 | | | | | | | |
| 6121-C | 2/1.00 | | | | | | | |
| 6121-D | 2/1.00 | | | | | | | |
| 99 Units | | | 48.5% Occupied | 41,049.00 | 2,400.00 | 1,200.00 | | |
| | | | | | | | | |
| Total 99 Units | | | 48.5% Occupied | 41,049.00 | 2,400.00 | 1,200.00 | | |

Created on 03/23/2022

Page 4

**SCHEDULE 6.3**

<u>LIST OF SERVICE CONTRACTS</u>

1. Contract dated January 25, 2022 with Bushwackers Lawn Care and Snow Removal.

2. Property Management Agreement dated October 26, 2021 with 33 Management, L.L.C.

3. Standard Laundry Room Lease dated June 1, 2008 with Clark/School LLC.

4. Service Agreement for 2391 Dixie Dr., Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

5. Service Agreement for 2400 Dixie Dr., Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

6. Service Agreement for 6031 Canden, Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

7. Service Agreement for 6086 McCasland, Portage, IN dated November 23, 2021 with Star Disposal of Indiana.

**SCHEDULE 6.4**

<u>LIST OF VIOLATIONS</u>

NONE